951 A.2d 1110

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Ronald GIBSON, Appellant.**

Supreme Court of Pennsylvania.

Submitted June 26, 2002.

Decided July 24, 2008.

Castille, C.J., issued concurring opinion in which McCaffery, J., joined.

Eakin, J., issued opinion concurring in part and dissenting in part.

James H. Moreno, Esq., Defender Association of Philadelphia, Philadelphia, for Ronald Gibson.

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Justice SAYLOR.[1]

After remand in this capital post-conviction appeal, we address the appellant's allegations of trial court error, prosecutorial misconduct, and ineffective assistance of counsel.

1. This case was reassigned to this author.

On December 24, 1990, Appellant and two companions, Gregory Tancemore and David Green, drove to a Philadelphia bar known as Woody's Playhouse, where approximately thirty other patrons were present. Appellant entered a restroom at the rear of the establishment, where he confronted an off-duty bouncer, pointing a .45 caliber semi-automatic handgun at his stomach. A struggle ensued, and Tancemore fired his 9 millimeter semi-automatic handgun into the ceiling as an apparent warning. Appellant and Tancemore fired more shots while fleeing from the bar, resulting in fatal injuries to the victims, Vernae Nixon and off-duty police officer Frederick Dukes. Tancemore drove away with Green and picked up Appellant, who had been running in a different direction, a few blocks away.

Two days later, a barmaid and the off-duty bouncer identified Appellant from photographic arrays, and Appellant was arrested that afternoon.[2] Appellant waived his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and gave a statement to detectives. At first, Appellant admitted that he had been present at the scene of the killings, but he denied firing any shots. Rather, he indicated that Tancemore carried both the 9 millimeter and .45 caliber handguns and had given him a .380 caliber pistol as the two entered the bar. He also stated that Tancemore told him to follow the bouncer, whom Tancemore believed was selling cocaine, to the restroom and detain him there at gunpoint. Appellant explained that the struggle began when the bouncer saw the handgun and continued until Tancemore began shooting from the front of the bar. Appellant indicated that, when he reached the front of the bar, Tancemore told him to "get the money" and that Tancemore had fired all of the shots.

During a break in the interview, however, the detectives questioning Appellant learned that a .45 caliber handgun had been seized from Green's apartment and that Green had given

2. Tancemore was also identified by several witnesses. However, he fled from the police, took two women hostage in their home, and ultimately committed suicide with a 9 millimeter semi-automatic handgun before he could be apprehended. *See Commonwealth v. Gibson,* 547 Pa. 71, 83 n. 6, 688 A.2d 1152, 1158 n. 6 (1997).

a statement, claiming that Appellant had hidden it there. When confronted with this information, Appellant admitted that the .45 caliber handgun was his, that he had brought the gun to the bar, and that he had concealed the gun within Green's apartment. Appellant also stated that, after reaching the front of the bar, he saw Officer Dukes draw his weapon, and that he fired three shots at the officer before fleeing the scene. Based upon these statements, witness interviews, and physical evidence, Appellant was charged with two counts of first-degree murder, *see* 18 Pa.C.S. § 2502(a), two counts of criminal conspiracy, *see* 18 Pa.C.S. § 903, and one count of robbery, *see* 18 Pa.C.S. § 3701.

Initially, Appellant was represented by appointed counsel, Thomas Ciccone, Esquire, who appeared at Appellant's preliminary hearing and arraignment. Apparently dissatisfied with this representation, however, Appellant retained Oscar Gaskins, Esquire, to represent him shortly before trial was scheduled to commence. The trial court initially directed Attorney Ciccone to be present and cooperate with Appellant's new attorney throughout the course of the proceedings. Subsequently, during suppression proceedings, the prosecutor expressed a concern regarding the eleventh-hour substitution of counsel and requested that the trial court conduct a brief colloquy with Appellant. Appellant indicated that he was satisfied with the representation of Attorney Gaskins, and that he was ready to proceed with the joint representation. *See* N.T. September 24, 1991, at 6.

Individual voir dire commenced immediately upon the denial of suppression. At the outset, the prosecutor expressed a concern that Attorney Ciccone was not present, in violation of the court's order. Attorney Gaskins stated as follows:

I don't have any problem with your order or with Mr. Ciccone. The problem is that the defendant is satisfied with my representation.

\* \* \*

I don't see any necessity of continuing to march him up and ask him questions.

N.T., September 26, 1991, at 2–3. Thereafter, trial proceeded with Attorney Gaskins representing Appellant, but with Attorney Ciccone absent.

In its case in chief, the Commonwealth presented the testimony of several eyewitnesses, including the barmaid and off-duty bouncer, who described the events that occurred on the night of the murders and positively identified Appellant as a shooter. The bouncer also identified the weapon that Appellant had in his possession as a .45 caliber handgun. Several police officers and detectives testified concerning their roles in collecting evidence from the scene and the circumstances surrounding Appellant's apprehension and questioning. Further, a ballistics expert described his tests of the bullets and cartridge casings recovered from the scene of the killings, as well as the weapons involved, concluding with his opinion that a bullet recovered from the body of Officer Dukes was a .45 caliber bullet fired from the handgun recovered from Green's apartment. The medical examiner explained his findings from the post-mortem examinations of the victims. Finally, the Commonwealth introduced Appellant's statements implicating himself in the crimes.

The defense countered by contesting the identification of Appellant by the Commonwealth's witnesses and challenging Appellant's ownership of the murder weapon. The defense also presented testimony that Appellant's statements to the detectives had been coerced by physical force, with several witnesses stating that his appearance at his arraignment was consistent with his having been beaten. Appellant testified on his own behalf that he had been drinking with Tancemore and Green prior to the killings; he had no knowledge of a planned robbery; although he carried a .380 caliber handgun into the bar, he did not fire any weapon; Tancemore and Green did the shooting; and the .45 caliber pistol was Green's. Appellant also indicated that the detectives had physically assaulted him to obtain his incriminating statements. Finally, the defense presented several character witnesses who testified to Appellant's reputation for truthfulness.

The jury found Appellant guilty of all charges, and, in the penalty phase, the Commonwealth offered as aggravating circumstances that the killings occurred during the perpetration of a felony, see 42 Pa.C.S. § 9711(d)(6); the defendant knowingly created a grave risk of death to other persons in addition to the victims of the offense, see 42 Pa.C.S. § 9711(d)(7); and the defendant had been convicted of another murder committed either before or at the time of the offenses at issue, see 42 Pa.C.S. § 9711(d)(11). With regard to the murder of Officer Dukes, the Commonwealth additionally argued that the victim was a peace officer killed in the performance of his duties. See 42 Pa.C.S. § 9711(d)(1). In support, the Commonwealth presented no testimony, but, instead, relied upon the record of testimony adduced at the guilt phase, the file reflecting Appellant's convictions in the present matter, and a stipulation from defense counsel that Officer Dukes was in possession of his police identification, badge, and pistol when he was killed.

Appellant offered as mitigating circumstances his lack of a significant history of prior convictions, see 42 Pa.C.S. § 9711(e)(1), his age at the time of the offenses, see 42 Pa.C.S. § 9711(e)(4), and the catch-all mitigator, see 42 Pa.C.S. § 9711(e)(8). To support these factors, Appellant presented several character witnesses, consisting primarily of members of his family and his friends, who testified that: he was twenty-two years old at the time of the murders; he was a good student in high school and attended community college for a time; his father was absent throughout most of his childhood; he was a good father to his own child; he was amenable to discipline from his family members; and the murders were out of character for Appellant. The jury returned sentences of death, finding that the three aggravating circumstances unanimously found—that the killing occurring during a felony, the defendant created a grave risk of death to another person, and the defendant was convicted of another murder—outweighed the sole mitigating circumstance found by any juror—that Appellant had no significant criminal history.

After several delays, Attorney Gaskins was permitted to withdraw from his representation, the trial court appointed substitute counsel to represent Appellant, and post-trial motions were filed. Following several more delays, the trial court conducted a hearing on such motions and, in February 1995, it reimposed Appellant's death sentences, which were affirmed on direct appeal. *See Commonwealth v. Gibson*, 547 Pa. 71, 688 A.2d 1152 (1997).

In November 1997, Appellant filed a timely *pro se* petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (the "PCRA"). New counsel was appointed and filed an amended petition, later supplemented with additional claims, raising numerous grounds for relief, which included allegations that: (1) counsel was ineffective for failing to investigate and present mitigation evidence related to Appellant's intoxication at the time of the murders, history of drug and alcohol abuse, and dysfunctional family life at the penalty phase; (2) the Commonwealth withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) the Commonwealth exercised its peremptory challenges in a racially discriminatory manner and, for this reason and others, Appellant's death sentence was the product of improper racial discrimination; (4) the trial court erred in failing to grant Appellant's request for a pretrial continuance; (5) the jury was improperly death qualified; (6) trial counsel was ineffective for failing to present evidence of Appellant's diminished capacity during the guilt phase; (7) counsel was ineffective for failing to investigate and present evidence of Green's role in the murders; (8) counsel was ineffective for failing to obtain and adequately challenge the "ballistics" report; (9) the trial court erred in failing to grant a continuance to the defense to locate a witness; (10) the "overwhelming" presence of uniformed police officers in the courtroom deprived Appellant of his right to a fair trial; (11) the Commonwealth violated Appellant's right to due process in failing to test the alleged murder weapon for fingerprints; (12) the trial court erroneously instructed the jury on the murder of both victims together, relieving the Commonwealth of its burden to prove

every element of the offense; (13) the trial court erred in failing to give a voluntary statement instruction; and (14) prosecutorial misconduct occurred in the guilt and penalty phases. In a separate count, Appellant also argued that, where claims of error were not adequately preserved, trial counsel was ineffective for failing to make objections, and appellate counsel provided ineffective assistance in failing to raise these and other matters on direct appeal. The Commonwealth filed a motion to dismiss, asserting, *inter alia,* that Appellant's claims were either waived, previously litigated, or meritless. The PCRA court granted the motion, finding an evidentiary hearing unnecessary. In its opinion, the court noted that all of Appellant's claims had been either waived or previously litigated, and, addressing the substance of each claim, found them to be without merit.

In particular, with respect to the claim of ineffective assistance of trial counsel for failing to investigate and present mitigation evidence, the court took the position that trial counsel had presented "a very strong case of mitigation at the penalty hearing," describing such case as follows:

Counsel called nine witnesses to testify to defendant's good character; defendant's mother, grandmother, grandfather, uncle, two aunts, a friend since high school, the mother of his daughter and a friend of the family's. Defendant's mother testified that her son was a very good student who graduated 20th in his class at Simon Gratz High School, was senior class president and went to community college. Mrs. Gibson also testified that her son grew up in a "jungle," that there are crack houses across the street and two doors down from her house and that defendant's father left when defendant was 21 mo[n]ths old. Defendant's uncle testified that defendant was a respectful and pleasant person who did very well in school. Defendant's grandmother testified that he was a loving grandson. The mother of defendant's daughter testified that defendant "has always been there for me and my daughter." All of the nine witnesses called on defendant's behalf testified as to his good character. De-

fense counsel presented a thorough and strong case for mitigation to the jury.

*Commonwealth v. Gibson,* No. 2809, January Term, 1991, *slip op.* at 16 (C.P.Phila.Jan.8, 2001) (citations omitted). The court characterized as "pure speculation" Appellant's assertion that the jury might have found his intoxication, substance abuse, or background to be a mitigating factor or to have sufficient weight to overcome the multiple and weighty aggravating circumstances. *Id.* at 16–17. Further, the court noted this Court's admonition that counsel will not be considered ineffective merely for choosing one strategy over another. *See id.* at 17 (citing *Commonwealth v. Hardcastle,* 549 Pa. 450, 461, 701 A.2d 541, 546 (1997)).

On appeal to this Court, Appellant raised many of the same claims presented to the PCRA court, and, in December 2005, this Court remanded the matter for evidentiary development, findings of fact, and conclusions of law with regard to Appellant's allegations of trial counsel's ineffectiveness in failing to adequately investigate and present mitigating evidence. We also directed the PCRA court to address all aspects of the layered ineffectiveness claim and retained jurisdiction over the matter.[3] Appellant filed a supplemental brief with the PCRA court to conform his arguments in this regard to this Court's requirements for claims of ineffective assistance of appellate counsel, *see Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), and to apprise the court of new developments in the law.

The PCRA court subsequently conducted an evidentiary hearing, at which Appellant's trial counsel testified that, due to his eleventh-hour retention, he lacked adequate time to pre-

3. Mr. Justice Nigro filed a concurring and dissenting statement, developing his position that the scope of the remand should be limited to the development of Appellant's claim with regard to the ineffective assistance of appellate counsel, as, in his view, Appellant had already demonstrated trial counsel's ineffectiveness by submitting written witness declarations in support of his PCRA petition. Mr. Justice Eakin, joined by Mr. Justice Castille and Madame Justice Newman, issued a dissenting statement, expressing the belief that trial counsel's decision to present evidence of the positive aspects of Appellant's life was the result of a reasonable strategy.

pare for trial and did little or no investigation or preparation for the penalty phase of trial. *See* N.T. April 10, 2006, at 45–46, 48–49, 50–51, 103.[4] Appellate counsel testified that he conducted no investigation of extra-record claims, such as a challenge to trial counsel's stewardship in the development of mitigating circumstances, since it was his understanding that his role was confined to a review of the existing record and presentation of record-based claims. *See id.* at 133–34, 136.[5] Appellant's mother testified to an entrenched family history of alcoholism and drug use, which Appellant witnessed as a young child and to which he ultimately succumbed. *See id.* at 106–10. According to Mrs. Gibson, Appellant began drinking alcohol at fourteen years of age and by age nineteen was intoxicated frequently. *See id.* at 111. Mrs. Gibson also testified that Appellant witnessed and was a victim of domestic abuse in the household at the hands of his father and other men. *See id.* at 111–17. She indicated that, prior to her testimony at the penalty phase of trial, trial counsel asked her no questions concerning Appellant's background or life circumstances, did not explain mitigation in a capital case, and did not prepare her as a witness. *See id.* at 118–19.[6] The PCRA court refused to permit Appellant to present other fact witnesses or testimony from mental health professionals.

The court then issued an opinion concluding that Appellant was entitled to a new penalty hearing. Initially, the court

---

**4.** An investigator who had been retained in connection with trial also confirmed counsel's assertions that there was no pre-trial penalty phase investigation. *See* N.T., April 10, 2006, at 10–15.

**5.** Counsel's understanding in this regard was inconsistent with prevailing law. *See Commonwealth v. Hubbard,* 472 Pa. 259, 276 n. 6, 372 A.2d 687, 695 n. 6 (1977) ("[I]neffectiveness of prior counsel[, including extra-record claims,] must be raised as an issue at the earliest stage in the proceedings at which the counsel whose effectiveness is being challenged no longer represents the defendant."). Parenthetically, this Court has abandoned the *Hubbard* approach for subsequent cases, holding that, in the usual case, claims of ineffective assistance should be deferred to post-conviction proceedings. *See Commonwealth v. Grant,* 572 Pa. 48, 67, 813 A.2d 726, 738 (2002).

**6.** Mrs. Gibson also testified that trial counsel was intoxicated and fell asleep during the trial; however, the PCRA court rejected this testimony on credibility grounds.

attributed the change to the development of death penalty jurisprudence subsequent to the court's 2001 opinion and a reexamination of trial and appellate counsel's performance in light of those developments. Applying the three-prong test for actionable ineffectiveness as developed in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987),[7] the court found arguable merit to the claim, crediting the testimony of trial counsel and the investigator that no advance work whatsoever was done in preparation for the penalty phase; preparatory interaction with witnesses was extremely limited; and life-history evidence was not collected. *See Commonwealth v. Gibson*, No. 2809, January Term, 1991, *slip op.* at 4 (C.P.Phila.Apr. 26, 2006) ("[Trial counsel] basically took a fee, did no preparation at all and went to court."). Referencing *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and guidelines for the conduct of capital counsel published by the American Bar Association, the court explained that trial counsel's performance is deficient whenever he breaches the duty to conduct a thorough investigation of the defendant's background. *See Gibson*, No. 2809, January Term, 1991, *slip op.* at 4. According to the court,

> [h]ad [counsel] conducted even a cursory investigation, [he] would have uncovered evidence of [Appellant's] intoxication at the time of the crime, [his] personal and family history of drug and alcohol abuse, and a dysfunctional family life.

---

7. To obtain relief on a claim of ineffective assistance of counsel, a petitioner must demonstrate that the underlying claim is of arguable merit, no reasonable basis existed for counsel's action or inaction, and counsel's error caused prejudice such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *See Commonwealth v. Pierce*, 567 Pa. 186, 203, 786 A.2d 203, 213 (2001); *Commonwealth v. Kimball*, 555 Pa. 299, 312, 724 A.2d 326, 333 (1999); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (explaining that, to establish an ineffective assistance claim, a defendant must show that counsel's performance was deficient and that such deficiencies prejudiced the defense). Counsel is presumed to have rendered effective assistance, *see Commonwealth v. Basemore*, 560 Pa. 258, 277 n. 10, 744 A.2d 717, 728 n. 10 (2000) (citing *Commonwealth v. Copenhefer*, 553 Pa. 285, 301, 719 A.2d 242, 250 (1998)), and, if the petitioner fails to satisfy any prong of the ineffectiveness inquiry, his claim will be rejected. *See Commonwealth v. Malloy*, 579 Pa. 425, 448, 856 A.2d 767, 781 (2004) (citing *Pierce*, 567 Pa. at 217, 786 A.2d at 221–22).

Family members, had they been seriously interviewed with probing questions, could have informed trial counsel of [Appellant's] exposure to years of domestic violence and the subsequent abandonment by his father. At the PCRA hearing, [Appellant's] mother, Joan Gibson, provided ... a brief history of both her exposure and her son's exposure to domestic violence. Additionally, Mrs. Gibson testified that following the abandonment by her husband, she lived with other men who abused drugs in her home and exhibited violent behavior. The drug abuse and violence occurred when [Appellant] was eight or nine years old. All of this information could have then been appropriately presented at the penalty phase of [Appellant's] trial as mitigation evidence, through the use of a mental health professional. Based upon the foregoing, [Appellant's] claim is of arguable merit.

*Id.* at 4–5 (citations omitted).

As to reasonable basis, the PCRA court observed that trial counsel testified that his failure to conduct a penalty-phase investigation was not a tactical or strategic decision. *See* N.T. April 10, 2006, at 117 (reflecting counsel's testimony that, "We did not believe we would get to the penalty phase, the way we, in fact, did. And I certainly didn't have enough time—I had very little time to even discuss the earlier stage of the trial."). The PCRA court indicated that it was apparent that counsel did not explore issues that would have led him to uncover available mitigating evidence. The court characterized the evidence that would have been uncovered as overwhelming and deemed counsel's inactions unreasonable.

Finally, in terms of prejudice, the court developed that a defendant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceedings would have been different. *See Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068 (explaining that a "reasonable probability is a probability sufficient to undermine confidence in the outcome"). The court reasoned:

An inspection of the jury's sentencing verdict and finding sheets for each victim reveal that, although submitted, the

jury did not find the catch-all mitigator. This is not surprising, given the complete lack of mitigating evidence presented by [trial counsel]. Even the prosecutor commented during the penalty phase:

"And I submit to you that what you saw and what you heard in mitigation was not an effort to address the evidence of mitigation, but an effort to engender your sympathy, not for this defendant but for those people who expended uselessly their affection on his behalf."

*Gibson,* at 7. The PCRA court found it clear that the jury was not presented with essential mitigation evidence, describing the defense penalty-phase evidence as "a sham effort to elicit positive character testimony from witnesses who would 'cry and beg the jury not to sentence [Appellant] to death.'" *Id.* (quoting testimony from the defense investigator). Further, the court found "a shocking lack of preparation [that] was so far below the standard of adequate representation as to render the concept of effective assistance of counsel virtually meaningless." *Id.* Thus, according to the PCRA court, there was a reasonable probability that the outcome of the penalty deliberations would have been different had the jurors been presented with the mitigating evidence developed at the post-conviction stage. *See id.*

Surprisingly, although our remand order authorized briefing, neither party filed supplemental briefs with this Court following the PCRA court's decision. Nevertheless, as our jurisdiction was retained, we proceed to consider the PCRA court's resolution of all claims raised by Appellant.

█ In addressing the grant or denial of post-conviction relief, we consider whether the PCRA court's conclusions are supported by record evidence and are free of legal error. *See Commonwealth v. Jones,* 590 Pa. 202, 216, 912 A.2d 268, 276 (2006) (citing *Commonwealth v. Travaglia,* 541 Pa. 108, 117 n. 4, 661 A.2d 352, 356 n. 4 (1995)). Consistent with the eligibility requirements for PCRA relief, Appellant frames his claims as involving violations of the United States or Pennsylvania Constitutions, including the denial of effective assistance of

counsel. *See* 42 Pa.C.S. § 9543(a)(2)(i, ii). As noted, to prevail on his ineffectiveness allegations, Appellant must demonstrate that the underlying claim is of arguable merit; that no reasonable strategic basis existed for counsel's act or omission; and that counsel's error resulted in prejudice, or, in other words, that there is a reasonable probability that the outcome would have been different. *See supra* note 7. In addition, Appellant is required to establish that his claims have not been previously litigated or waived. *See* 42 Pa.C.S. § 9543(a)(3). In the latter regard, since Appellant was represented by new counsel on direct appeal, his claims of ineffective assistance of trial counsel that were not raised at that time are waived, and the only extant ineffectiveness claims are derivative ones challenging appellate counsel's performance relative to the underlying ineffectiveness claims. *See McGill*, 574 Pa. at 586, 832 A.2d at 1021–22. While in a number of instances our below review entails evaluation of the potential merits of waived underlying claims, such assessment is employed solely as a means of determining the viability of extant derivative claims. *See id.* at 591–92, 832 A.2d at 1024–25 (explaining that a layered claim cannot be sustained where the underlying claim is unmeritorious).

## I. The Remand Claim

As developed above, the PCRA court's perspective concerning Appellant's claim of ineffective assistance associated with the development and presentation of mitigating evidence at the penalty phase of Appellant's trial changed dramatically after remand. In its initial opinion supporting the dismissal of the claim without evidentiary development, the court focused primarily on the strategy pursued at trial, finding that a "very strong case of mitigation" was presented. *See Gibson*, No. 2809, January Term, 1991, *slip op.* at 16 (1/8/2001). By contrast, after remand, the court indicated that there was a "shocking lack of preparation," a "complete lack of mitigating evidence," and a "sham effort" to mount a penalty-phase defense. *Gibson*, No. 2809, January Term, 1991, *slip op.* at 7 (4/26/2006). Although the PCRA court explained that

its reversal was due to the "development of death penalty jurisprudence," it did not identify a decision from any court which would have treated what the court now characterizes as a "sham effort" as adequate stewardship.

We recognize that, for some time now, both this Court and the United States Supreme Court have been operating with slim majorities and swing votes in the arena of capital-sentencing ineffectiveness claims. *See generally Commonwealth v. Uderra*, 580 Pa. 492, 524 n. 17, 862 A.2d 74, 93 n. 17 (2004) (noting substantial differences of opinion among Justices concerning the proper merits resolution of claims of ineffective assistance of counsel for failing to investigate, develop, and present mitigating evidence in capital cases).[8] Further, resolution of the cases is frequently fact-intensive, so that, other than in terms of the pronouncement of overarching standards, the precedential effect of individual decisions may be limited. While we certainly understand the difficulties that this may cause at the hearing-court level and are sympathetic to the substantial work required of the PCRA courts, we believe

---

**8.** For example, in the divided opinion in *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761 (2004), this Court confirmed the general applicability in Pennsylvania of the standards articulated in the United States Supreme Court's decisions in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). However, in *Commonwealth v. Romero*, 595 Pa. 275, 938 A.2d 362 (2007), three Justices supporting the lead opinion on the point indicated that *Wiggins* and *Williams* embody a standard that is more exacting than was in effect at the time of the defendant's trial (1996), and that the reasonableness of penalty-phase counsel's stewardship, therefore, could not be assessed under that standard. *See id.* at 317–19, 938 A.2d at 387–88. Thus, despite *Hughes*, after *Romero*, the applicable standards once again appear to be in controversy.

The dissent presently compounds this state of affairs by invoking various dissenting opinions of Justices of the United States Supreme Court. *See* Dissenting Opinion, *op.* at 479 & n. 1, 951 A.2d at 1156–57 & n. 1. However, it should go without saying that this Court, by virtue of the Supremacy Clause, is obliged to apply majority decisions of the United States Supreme Court on federal constitutional issues to all cases pending within our jurisdiction unless and until overruled by the Supreme Court. *See, e.g., Purple Orchid, Inc. v. PSP*, 572 Pa. 171, 179, 813 A.2d 801, 806 (2002). Accordingly, we fail to see the benefit of challenging principles embodied in presently prevailing High Court decisions by way of expressions of agreement with the dissents.

that, particularly in close cases, a developed post-conviction record accompanied by specific factual findings and legal conclusions is an essential tool necessary to sharpen the issues so that differences at the appellate level can be mitigated.

In this case, we conclude that additional development of the record concerning the mitigation-related claim is warranted relative to the prejudice prong of the ineffectiveness inquiry. In the first instance, the PCRA court's existing decisions regarding prejudice do not include a specific comparative evaluation concerning the mitigation case actually presented with that which Appellant currently alleges should have been presented. Indeed, as the Commonwealth emphasizes, some of the life-history aspects of the post-conviction mitigation case were developed in the penalty phase of trial. For example, Mrs. Gibson testified in the penalty-phase of Appellant's trial that he was raised in a very difficult neighborhood which she characterized as a "jungle," with crack houses two doors away and across the street. N.T., October 10, 1991, at 11. Additionally, through Mrs. Gibson's penalty-phase testimony, the jurors were also advised that Appellant's father had left the household when Appellant was twenty-one months old and did not participate in his upbringing. *See id.* at 12. In light of the admission of such evidence at trial, the PCRA court's indication that counsel should have uncovered Appellant's "abandonment by father," *see Gibson*, No. 2809, January Term, 1991, *slip op.* at 4 (4/26/2006), seems incongruous. Furthermore, some of Mrs. Gibson's post-conviction testimony concerning Appellant's youth appears to be facially in tension with her penalty-phase testimony that she was able to keep Appellant under control when he was younger, *see* N.T. October 10, 1991, at 11–12, raising apparent credibility questions which the PCRA court should have resolved expressly. Finally, the PCRA court appears to have prohibited Appellant from presenting his mental-health witnesses,[9] whose declarations

---

**9.** The transcript suggests that one of Appellant's mental-health witnesses was not available at the time of the evidentiary hearing on remand. *See* N.T., April 10, 2006, at 4. It is not clear, however, whether the unavailability was in light of the court's previous ruling that the witnesses would not be permitted to testify, *see id.,* or was for

develop the relevance of Appellant's alcohol and drug use in terms of mitigation.[10]

Given these difficulties, we find that, unfortunately, an additional remand is necessary to permit the PCRA court to address them. *Accord Commonwealth v. Williams*, 557 Pa. 207, 232–33, 732 A.2d 1167, 1189–90 (1999) (remanding to a PCRA court for specific factual findings and legal conclusions regarding, *inter alia*, trial counsel's stewardship connected with the alleged failure to present mitigating evidence). The court is expressly requested to resolve areas of factual controversy and credibility disputes via numbered factual findings. Further, given that there is some overlap between the trial and post-conviction cases in terms of the lay life-history testimony, it appears that determinations concerning the credibility and impact of the mental-health mitigation may be dispositive of the present claim.[11] Therefore, as part of the

another reason that could fairly support a conclusion that a fair opportunity was provided for presentation of the testimony.

**10.** For example, the declaration of Lawson F. Bernstein, M.D., indicates as follows:

[Appellant's] mental state and impairment as a result of his headaches, alcohol/drug self-medication, organic mood disorder and super-imposed acute intoxication would have provided substantial mental health mitigating evidence. [Appellant's] illnesses caused a significant impairment in his mental and emotional functioning, including deficits in key areas of cognition, memory, reasoning, attention span, judgment, learning, impulse control, emotional lability and the ability to weigh and appreciate consequences, and the ability to understand cause and effect. [Appellant's] aggregate neuropsychiatric condition constituted an extreme neurological, mental and emotional disturbance[.]

If believed, this evidence would obviously implicate the mitigating circumstance under Section 9711(e)(2), 42 Pa.C.S. § 9711(e)(2) (establishing the mitigating circumstance that "[t]he defendant was under the influence of extreme mental or emotional disturbance.").

**11.** Notably, at least on the face of Appellant's proffer, alcoholism and drug use are intertwined with the mental-health mitigation. Since alcohol and drug use may be regarded by at least some jurors as having a substantial volitional component, creditable medical/mental-health testimony may assume a heightened role in such cases. More generally, there is at least some empirical support for the notion that mental-health mitigation may have substantial impact in penalty proceedings, *see, e.g.*, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum L.Rev 1538, 1559 (1998)

remand proceedings, the PCRA court is to permit develop-
ment of the mental-health mitigation evidence (as well as
appropriate cross-examination and rebuttal evidence by the
Commonwealth), or to explain why the presentation of such
evidence should be precluded if there is some relevant default
on Appellant's part. Finally, the PCRA court is to develop a
specific comparison of the mitigation case offered at trial with
the credited evidence offered on post-conviction review, with
the object of elaborating as to why it is reasonably probable
that at least one juror might have assigned weight to Appel-
lant's credited post-conviction evidence equal to or greater
than the substantial aggravation found by the sentencing jury.

The PCRA court need not revisit the arguable merit
and reasonable strategy prongs of the ineffectiveness inquiry,
however, as we conclude that its present findings in such
respects are sufficient and supported. It is well established
that capital counsel has the "obligation to conduct a thorough
investigation" for possible mitigating evidence, *Williams*, 529
U.S. at 396, 120 S.Ct. at 1514–15 (citing ABA STANDARDS FOR
CRIMINAL JUSTICE (2d ed.1980)), or to make reasonable deci-

(finding evidence of mental retardation and mental illness to be the
most persuasive mitigating factors, after residual doubt), and certainly
various other courts have stressed the potential mitigating effect. *See,
e.g.,; United States v. Barnette*, 211 F.3d 803, 825 (4th Cir.2000) (stating
that "psychiatric evidence is an important part of many trials"); *Baxter
v. Thomas*, 45 F.3d 1501, 1515 (11th Cir.1995) ("Psychiatric mitigating
evidence 'has the potential to totally change the evidentiary picture).' "
(quoting *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir.1988));
*People v. Coleman*, 168 Ill.2d 509, 214 Ill.Dec. 212, 660 N.E.2d 919, 934
(1995) ("We acknowledge the critical importance of a defendant's
background and mental health to the sentencing decision.").

Mr. Justice Eakin appears to discount the notion that mental-health
mitigation can be beneficial to a capital defendant in sentencing pro-
ceedings. *See* Concurring and Dissenting Opinion, *op.* at 1157. How-
ever, such understanding is embedded in long-standing precedent of the
United States Supreme Court. *See Penry v. Lynaugh*, 492 U.S. 302,
319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) (explaining that
"evidence about the defendant's background and character is relevant
because of the belief, long held by this society, that defendants who
commit criminal acts that are attributable to a disadvantaged back-
ground, *or to emotional and mental problems*, may be less culpable than
defendants who have no such excuse)" (quoting *California v. Brown*,
479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987)) (O'Con-
nor, J., concurring) (emphasis added).

sions that render particular investigations unnecessary. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. *See id.* at 690–91, 104 S.Ct. at 2066. In undertaking the necessary assessment, reviewing courts are to take all reasonable efforts to avoid distorting effects of hindsight. *See Commonwealth v. Basemore,* 560 Pa. 258, 289, 744 A.2d 717, 735 (2000). Nevertheless, courts must also avoid *"post hoc* rationalization of counsel's conduct." *Wiggins,* 539 U.S. at 526–27, 123 S.Ct. at 2538.

Here, the credited evidence supports the conclusion that no pre-trial investigation of mitigating evidence was undertaken. While in light of Attorney Gaskins' late entry into the case, it is certainly debatable whether the deficient stewardship should be attributed to him or to Appellant's original counsel whom Attorney Gaskins replaced, this question is largely collateral to the present inquiry.[12] For our purposes, it is enough that there is a supported finding that no pre-trial investigation was undertaken, and there is no evidence (or finding) that some reasonable professional judgment supported the limitation of the investigation.

## II. The Remaining Claims

### A. *Brady* Claim

■ Appellant contends that the Commonwealth withheld the statement provided to detectives by David Green, thus violating the rule of *Brady,* 373 U.S. at 83, 83 S.Ct. at 1194, which holds that the failure to disclose material, exculpatory evidence violates the Due Process Clause of the Fourteenth

---

**12.** While Appellant made the decision to replace his original counsel, there is evidence of record suggesting that such attorney conducted no investigation concerning mitigation. *See* N.T., April 10, 2006, at 11, 49–50 (reflecting that the file received from Appellant's original counsel contained no record of a mitigation investigation). Thus, Appellant's decision appears to have been well founded, and it seems unlikely that he would have been in any better position had he permitted his original counsel to proceed.

Amendment. Appellant observes that Green's statement was not included with the discovery materials disclosed by the Commonwealth prior to Appellant's trial. *See* Letter to Thomas Ciccone, Feb. 7, 1991; *see also* Ciccone Declaration, ¶ 3; Gaskins Declaration, ¶ 3. Further, Appellant highlights the Commonwealth's repeated denials, *see* Letter from Jan Folena to Ellen Berkowitz, April 13, 1998; N.T. December 28, 1998, at 7 ("We know of no statement taken from David Green. We don't have it, and it wasn't provided to trial counsel because we don't have it."), contradicted by the eventual disclosure of the statement in May 1999, *see* Letter from Andrew Klein to John Cotter, May 21, 1999.

In asserting that Green's statement was favorable to his defense, Appellant observes that Green informed the detectives that:

[Appellant] had stayed over my place on Sunday night. On this past Monday it was around 2 or 4 o'clock in the afternoon and we decided to go up to this bar at 29th & Chalmers, it's called DONNERS ... When we got to DONNER's, we had a couple of drings [sic] and [Appellant] saw this guy he knew, [Tancemore]. I had met [Tancemore] about 2 or 3 weeks before at this other club, NINO's at Broad & Girard. The 3 of us stayed in DONNER's for a couple of hours and then we left and was riding to West Philly to see some boy....

... I went into the bar. I saw [Tancemore] talking to some guys a little ways down the bar and [Appellant] was sitting at the bar and he was sipping his drink.... My beeper went off while I was in the bar so I left and went outside and used the phone.... I just was sitting in the front passenger seat for about 2 minutes and all of a sudden some people came running out of the bar and then I seen [Tancemore] running from the bar and it was like chaos. I was half asleep at first and *[Tancemore] ran to the car and jumped in the driver's seat. I seen that his gun in his hand [sic].... I said to him, "what happened", and he said, "I shot a couple of people".* I asked him why but he didn't

> say nothing right away but then he said something about him and some guy got into a[sic] arguement [sic].

Statement of David Green, Dec. 26, 1990, at 2–3 (emphasis added). Appellant contends that this statement would have alerted counsel to the possible defense of voluntary intoxication or potential mitigating factors relative to the penalty phase. *See* Brief for Appellant at 13 (citing 42 Pa.C.S. § 9711(e)(2), (e)(3), (e)(8)). Further, Appellant argues that the statement would have supported his trial contentions that no robbery had been planned and that Tancemore had committed the killings, as Green denied any knowledge of a planned robbery and heard Tancemore admit to having an argument with someone and shooting "a couple of people." Appellant also maintains that Green's statement was material to the defense, relying on the declarations of Attorneys Ciccone and Gaskins, who stated that the statement would have substantially affected their preparation and trial strategy. Although Appellant admits that there are aspects of Green's statement that could have harmed his defense, he claims that the favorable portions of the statement far outweigh any potential harm and created a reasonable likelihood that a jury, upon learning of Green's statement or hearing him testify, would have rejected the Commonwealth's conspiracy theory.

The Commonwealth, on the other hand, contends that the *Brady* claim is waived because it was not raised at trial and has not been properly layered in Appellant's submissions. Furthermore, the Commonwealth stresses that it was apparent at the time of trial that Green had given a typewritten statement to detectives; therefore, there is no doubt that both trial and appellate counsel knew of the statement's existence. The Commonwealth highlights that Appellant has never offered to prove that the Commonwealth intentionally suppressed Green's statement, a necessary requirement of a *Brady* claim. The Commonwealth also stresses that Green's statement was neither favorable nor exculpatory, but rather, powerfully incriminated Appellant. In this regard, the Commonwealth relies on the following passages from the statement:

After [Appellant] got into the car him and [Tancemore] started talking about what happened in the bar and *[Appellant] said, "I think I hit somebody"* and [Tancemore] said, "yeah, I think I hit somebody too".

\* \* \*

[The next day, after seeing Appellant outside my apartment], I asked [my niece and brother] what did [Appellant] do in the house and they told me he had got some clothes. My niece told me that [Appellant] had used the bathroom to change some clothes before he left. About 15 minutes later I went outside and I seen that [Appellant] and his car was gone. It was just starting to get dark then.... When I went to bed last night I took my money and I was putting it under my mattress and that's when I seen the gun there. It was in a tan sack and when I picked it up that's when I knew it was a gun. *When I looked at the gun that's when I knew it was [Appellant's] gun. I knew he had a 45,* I think it's a Llama. I first knew he had the 45 about 3 weeks ago when I seen him carrying the gun tucked in his pants.... Then around 10:30 or 11 this morning [Tancemore] called me and that's when I found out that 2 people had been killed at the bar. Then [Tancemore] called, he said, "yeah, did you see the news", and I toldhim [sic] no, then he said, "it made the news, those two people *we shot* in the bar died, one of them was a[cop] and one of them was a lady" ... That's when I said to him, *"I looked under my mattress and found [Appellant's] gun that he had left there".* That's when [Tancemore] told me, "if you know like I know you had better get rid of that gun" ...

Green Statement at 3–5 (emphasis added). In light of these passages, the Commonwealth develops that the statement implicated Appellant as the owner of the murder weapon, as having shot at least one person, and as having hidden the pistol in Green's apartment, thus providing strong corroboration for the prosecution case. To the degree that Appellant argues that the statement would have alerted his counsel to his voluntary intoxication, the Commonwealth notes that, had

Appellant truly been intoxicated, he obviously would have known this himself. In fact, the Commonwealth highlights that Appellant freely stated that he had been drinking on the night of the offense, *see* N.T., October 7, 1991, at 78–80, which would have apprised counsel of the possibility of any relevant defense. According to the Commonwealth, a claim of voluntary intoxication also would have contradicted Appellant's trial strategy, which was to maintain his innocence.

Appellant is correct that, contrary to the Commonwealth's assertion, there is evidence indicating that the contents of Green's statement were not disclosed until almost eight years after his trial. The PCRA court did not make any findings in this regard, but we recognize that the exact contents of Green's statement do not appear to have been revealed until after Appellant had filed his PCRA petition.[13] It is clear, however, that trial counsel was aware of the detectives' interview with Green before Appellant's trial commenced, since this was discussed at the pre-trial suppression hearing. *See* N.T. September 25, 1991, at 26–28; *see also* N.T. September 24, 1991, at 92–96. Further, at trial, a detective specifically testified that he had reviewed a typewritten statement by Green after questioning Appellant, *see* N.T. October 7, 1991, at 69, and therefore, trial counsel contemporaneously was aware of its existence. Since no *Brady* claim was asserted on the first opportunity at trial, it is presently cognizable, if at all, as a component of a derivative ineffectiveness claim.

For essentially the reasons developed by the PCRA court in its discussion of the underlying claim, we conclude that Appellant cannot establish prejudice relative to the derivative one. As the PCRA court developed, to establish a *Brady* violation, a defendant is required to demonstrate that exculpatory or impeaching evidence, favorable to the defense, was suppressed by the prosecution, to the prejudice of the defendant. *See Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); *Commonwealth v.*

13. Indeed, during the initial post-conviction proceedings, the Commonwealth incorrectly informed both Appellant and the court that such a statement did not exist. *See* N.T. December 28, 1998, at 7.

*Paddy,* 569 Pa. 47, 65, 800 A.2d 294, 305 (2002). To satisfy the prejudice inquiry, the evidence suppressed must have been material to guilt or punishment. *See Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–1197; *Paddy,* 569 Pa. at 66, 800 A.2d at 305. Evidence is material when there is a reasonable probability, sufficient to undermine confidence in the outcome of the trial, that the result of the proceeding would have been different had the evidence been disclosed. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *Commonwealth v. Burke,* 566 Pa. 402, 411, 781 A.2d 1136, 1141 (2001). The prosecution's duty under *Brady* incorporates disclosure of all exculpatory evidence, regardless of whether the defense specifically requests such materials, *see United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976); *Commonwealth v. Carson,* 590 Pa. 501, 544, 913 A.2d 220, 244 (2006), and extends to evidence in the possession of police agencies of the same government bringing the prosecution, *see Kyles,* 514 U.S. at 437, 115 S.Ct. at 1567 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."); *Commonwealth v. Lambert,* 584 Pa. 461, 470, 884 A.2d 848, 854 (2005); *Burke,* 566 Pa. at 413, 781 A.2d at 1142.[14]

In arguing that Green's statement would have been favorable to his defense, Appellant minimizes integrated inculpatory aspects, which, taken in their context, substantially undermine the allegedly exculpatory value of the statement. *Cf. Kyles,* 514 U.S. at 436, 115 S.Ct. at 1567 (noting that suppressed evidence is to be "considered collectively, not item by item"). As the Commonwealth develops, Green's statement not only implicates Appellant in the killings by his own

14. As developed in *Burke,* however, prior to a specific consideration of *Kyles,* this Court had maintained that district attorneys were not required to provide the defense with evidence that they did not possess and of which they were unaware, such as evidence exclusively within police custody. *See Burke,* 566 Pa. at 412, 781 A.2d at 1142 (citing cases). Notably, these decisions were in force at the time of the pretrial in this case. The controlling effect of *Kyles* was first recognized in *Burke. See id.* at 413, 781 A.2d at 1142.

admission, but also identifies the murder weapon, a .45 caliber handgun, as belonging to Appellant. The statement also corroborates the Commonwealth's contention at trial that Appellant took steps to conceal his involvement by hiding his handgun and attempting to implicate Green in the homicides. In addition, as the Commonwealth also argues, Green's statement was not necessary to alert counsel to the possibility of an intoxication or diminished capacity defense, since Appellant could have informed counsel that he had been intoxicated on the night of the offense, and, notably, Appellant himself testified at trial that he had in fact been drinking for some time prior to the murders. *See* N.T. October 7, 1991, at 79–80. Further, contrary to Appellant's argument, Green's statement did not demonstrate that no conspiracy to rob the bar existed, but instead, evidenced only that Green himself may not have been aware of such a conspiracy, a proposition that was consistent with Appellant's statement to the detectives. *See id.* at 40–41. Further, the PCRA court did not credit the declarations of Appellant's attorneys that the Commonwealth's disclosure of Green's statement would have altered the defense trial strategy, reasoning that the absence of Green's statement worked to Appellant's benefit, as it would have rebutted Appellant's own testimony at trial that it was Green who fired the fatal shots. *See* N.T. October 7, 1991, at 87–89.

For the above reasons, the non-disclosure of Green's statement does not undermine confidence in the outcome of Appellant's trial, and we will sustain the dismissal of this claim by the PCRA court. *See Commonwealth v. Travaglia,* 541 Pa. 108, 118, 661 A.2d 352, 357 (1995) ("If it is clear that Appellant has not met the prejudice prong of the ineffectiveness standard, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met.") (citing *Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674 (1984)).

## B. Alleged Racial Discrimination

Acknowledging that a claim under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was raised

on direct appeal, Appellant now contends that this Court should revisit the issue, as his argument does not rest upon the evidence that has been previously litigated. *See Commonwealth v. Miller*, 560 Pa. 500, 519 n. 9, 746 A.2d 592, 602 n. 9 (2000) ("Because this claim does not rest solely upon the previously litigated evidence, we will reach the merits of appellant's claim."). Specifically, Appellant asserts that a training tape made by the Philadelphia District Attorney's Office in 1987, which instructed assistant district attorneys in the use of peremptory strikes in a racially discriminatory manner, only recently came to light and evidences a systematic practice of discrimination on the part of the prosecution in violation of *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723, and *Swain v. Alabama*, 380 U.S. 202, 227–28, 85 S.Ct. 824, 839–40, 13 L.Ed.2d 759 (1965). Appellant also contends that systematic discrimination in jury selection in Philadelphia is demonstrated by a study of charging and sentencing practices by Professors David Baldus and George Woodworth. This Court, however, has consistently rejected claims that the training tape and/or the Baldus study sufficiently evidence discrimination in individual cases. *See Commonwealth v. Washington*, 592 Pa. 698, 739–40, 927 A.2d 586, 610 (2007) (collecting cases). Of particular relevance in this regard, the instructor on the training tape was not the prosecutor at Appellant's trial.

### C. Pretrial Continuance

Relying on the declarations of his attorneys and investigator, Appellant argues that his Sixth Amendment right to counsel and his Fourteenth Amendment right to a fair trial were violated by the trial court's failure to grant a continuance due to Appellant's retention of substitute counsel shortly before trial commenced. *See generally United States v. Cronic*, 466 U.S. 648, 659–60, 104 S.Ct. 2039, 2047–48, 80 L.Ed.2d 657 (1984). Appellant observes that, since *voir dire* began only two days after counsel requested a continuance, *see* N.T. September 26, 1991, at 4, the trial court erred in stating that nine days had elapsed between Appellant's retention of new representation and trial. In addition, Appellant contends that,

if a continuance was not requested on the record, trial counsel was ineffective in failing to so request, and he was prejudiced by that failure, as trial counsel could not conduct adequate investigation into potential trial strategies or mitigating evidence in such a brief period of time. Further, Appellant asserts that appellate counsel rendered ineffective assistance by not challenging trial counsel's failure in this regard on direct appeal.

The only suggestion of prejudice associated with the derivative claims contained within the declarations upon which Appellant relies derives from assertions by Appellant's former attorneys that, had they obtained Green's statement, they would have altered their strategy, since the statement contained exculpatory information in the form of Tancemore's admission to having shot bar patrons and Appellant's intoxication.[15] Neither declaration, however, addresses the context of the relied-upon passages, or their occurrence among highly inculpatory passages of Green's statement, reflecting a belief by Appellant that he had shot someone, Appellant's ownership of the .45 caliber handgun which killed Officer Dukes, and his concealment of the weapon at the location at which it was found by police. Further, and again, trial counsel did not need Green's statement to apprehend that Appellant had been drinking on the night of his offenses.

We conclude that Appellant's proffer failed to advance a sufficient claim of prejudice associated with the alleged failure of counsel to preserve a claim deriving from the denial of a continuance. Therefore, the PCRA court did not err in dismissing this claim without a hearing.

### D. Asserted Improper Death Qualification

 Appellant claims that a juror was improperly excused for cause, since, when asked by the trial court whether he was so irrevocably opposed to the death penalty as to be unable to follow the law, he stated "I guess not, no." Appellant relies

---

**15.** The defense investigator's statement also contains an indication that the Green statement would have greatly aided his investigation, but this assertion is not sufficiently specific to contribute to the prejudice assessment.

upon *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in which the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777. According to Appellant, the fact that this venireperson was excused from jury service even though he indicated that he could put aside his personal feelings is an example of improper death-qualification. Further, he asserts that all prior counsel were ineffective for failing to raise this claim.

The Commonwealth responds with assertions that this claim is waived and meritless. In terms of merit, the Commonwealth emphasizes the discretionary nature of a trial court's rulings on challenges for cause, *see Commonwealth v. Stevens,* 559 Pa. 171, 197, 739 A.2d 507, 521 (1999), and the standard by which such challenges are assessed. *See Commonwealth v. Morales,* 549 Pa. 400, 417–19, 701 A.2d 516, 524–25 (1997) ("The proper standard for determining when a prospective juror may be dismissed for cause is whether his views on capital punishment would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (quoting *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985))). The Commonwealth develops that, during voir dire, the referenced juror repeatedly and emphatically stated that he could not impose the death penalty, as follows:

THE COURT: Do you have any religious, moral, ethical beliefs against the imposition of the death penalty in a case?

PROSPECTIVE JUROR: I don't believe in it, no.

THE COURT: When you say you don't believe in the death penalty, is that based on religious belief?

PROSPECTIVE JUROR: I just don't believe it's right to take the life of anyone, no matter what.

THE COURT: Counsel.

[DEFENSE COUNSEL]: I have no questions.

[PROSECUTOR]: ... [J]ust so I understand exactly, I have to ask the question in a precise fashion. It is my understanding from your answer to the Judge's question that if you were forced to make a decision, no matter what the facts of a particular case were and no matter what the law is, you, because of your personal beliefs, would be unable to impose the death penalty on another individual, is that correct?

PROSPECTIVE JUROR: No, it's not. I don't believe in it.

[PROSECUTOR]: I'm saying, because of your beliefs, you would be unable to ever impose the death penalty, is that what you're saying?

PROSPECTIVE JUROR: Yes.

[PROSECUTOR]: Thank you.

THE COURT: Is your opposition to the death penalty such that you would automatically vote against the death penalty for this defendant regardless of the facts of this case?

PROSPECTIVE JUROR: I wouldn't change my opinion of what I think.

N.T. September 27, 2001, at 55–57. According to the Commonwealth, this Court has determined that trial courts dismissed prospective jurors properly for cause due to their opposition to the death penalty in cases far less obvious that the present one. *See* Brief for Appellee at 83–84 (citing, *inter alia, Commonwealth v. Cox,* 556 Pa. 368, 384, 728 A.2d 923, 930 (1999) (holding that a trial court did not abuse its discretion when it dismissed potential jurors for cause after their answers to two or more questions regarding their ability to impose the death penalty in an appropriate case indicated an inability to do so)). The Commonwealth stresses that, prior to his final statement, the venireperson had steadfastly and repeatedly maintained that he was opposed to the death penalty in every case, and that he would not change his opinion. The prospective juror's ultimate equivocation, the Commonwealth asserts, merely represented a "nearly desperate effort by a highly frustrated man to end this repeated and pointed questioning." *Id.* at 84.

We agree with the Commonwealth to the degree that its argument suggests that it was within the trial court's discretion to resolve the credibility issue arising from the prospective juror's contradictory responses. Further, Appellant has not presented a proffer which might warrant an evidentiary hearing on this claim.

## E. Diminished Capacity Defense

Appellant contends that his trial counsel was ineffective in failing to present a defense of diminished capacity or voluntary intoxication during the guilt phase of his trial. Appellant observes that, contrary to the PCRA court's conclusion, such a defense would not have been inconsistent with his own trial testimony, as in Appellant's view, he accepted responsibility for his involvement in the incident, *see* N.T. October 7, 1991, at 78, and admitted that he was armed at the time of the murders, *see id.* at 85. Appellant maintains that counsel has a duty to investigate mental health evidence related to a potential diminished capacity defense when counsel knew or, with reasonable investigation, should have known of a defendant's possible mental health problems. *See Commonwealth v. Legg,* 551 Pa. 437, 445–46, 711 A.2d 430, 433–34 (1998). In this regard, Appellant asserts that trial counsel admitted that he did not investigate the defense, and that this admission was corroborated by trial counsel's investigator. Because counsel's trial strategy cannot be reasonable absent adequate investigation of alternatives, Appellant argues that no reasonable strategic decision to present a different defense could have been reached in the present matter. *See Legg,* 551 Pa. at 446, 711 A.2d at 434 ("Because counsel did not investigate or could not recall investigating Appellant's mental history, we cannot agree with the Superior Court that he made a rational decision to avoid a diminished capacity defense."); *Commonwealth v. Perry,* 537 Pa. 385, 392, 644 A.2d 705, 709 (1994) ("Failure to prepare ... is simply an abdication of the minimum performance required of defense counsel.").

Appellant claims that, had trial counsel conducted any form of background investigation, he would have discovered Appel-

lant's history of alcohol and substance abuse from his prior court records, which included a psychological evaluation. *See* Mental Health Evaluation by Lawrence Byrne at 4 ("He has a significant history of Cocaine Abuse and also abuses Alcohol heavily."). Moreover, Appellant contends that evidence of his severely intoxicated state at the time of his offenses was readily available, as several witnesses could have provided information concerning both Appellant's history of substance abuse and his consumption on the night of the murders.[16] Appellant asserts that the failure of counsel to investigate and present this evidence and testimony to the jury creates a reasonable probability that the result of his trial would have been different. In conclusion, Appellant briefly asserts that appellate counsel was ineffective for failing to investigate and raise this claim on direct appeal.

In rejecting this claim, the PCRA court relied on the principle that counsel will not be found ineffective for failing to pursue a diminished capacity defense when the defendant maintains his innocence throughout the trial. *See, e.g., Commonwealth v. Fisher*, 559 Pa. 558, 582, 741 A.2d 1234, 1246–47 (1999). Reviewing Appellant's defense, the PCRA court determined that the evidence of diminished capacity and voluntary intoxication that Appellant contends should have been presented would have directly contradicted his own testimony

16. One witness, for example, would have explained that, at a different bar prior to the shootings, Appellant had consumed "at least six shots" of Southern Comfort and at least half of a bottle of champagne, rendering him unconscious. Another witness would also have informed counsel that he and Appellant had consumed "cough syrup and angel dust that night" and that Appellant "could barely walk" when he left the bar with Tancemore and Green. In addition, another witness would have explained that Appellant's alcohol abuse had significant effects on his memory. Moreover, Appellant observes that consultation with experts would have revealed the viability of a diminished capacity or voluntary intoxication defense. *See* Affidavit of Brian McMillen at 2 (Sept. 10, 1998) (estimating that Appellant's blood alcohol concentration at the time of the offense was 0.284%); Declaration of Lawson Bernstein, ¶ 6 (Feb. 23, 1999) ("[Appellant's] aggregate neuropsychiatric condition constituted an extreme neurological, mental and emotional disturbance, and substantially impaired the capacity to premeditate, deliberate and form specific homicidal intent and to be conscious of that intent during the time period in question.").

that he did not fire the gunshots that killed Ms. Nixon and Officer Dukes. *See, e.g.,* N.T. October 7, 1991, at 88. Thus, the court concluded that trial counsel was not ineffective for failing to present a defense that conflicts with Appellant's testimony. *See Commonwealth v. Laird,* 555 Pa. 629, 645–46, 726 A.2d 346, 354 (1999) (citing *Commonwealth v. Paolello,* 542 Pa. 47, 78–79, 665 A.2d 439, 455 (1995)).

As this Court has observed, diminished capacity and voluntary intoxication are limited defenses, which do not exculpate the defendant from criminal liability entirely, but instead negate the element of specific intent. *See Commonwealth v. Taylor,* 583 Pa. 170, 876 A.2d 916 (2005) (citing *Commonwealth v. Travaglia,* 541 Pa. 108, 123 n. 10, 661 A.2d 352, 359 n. 10 (1995)). Thus, a defendant asserting either defense admits responsibility for the underlying action, but contests the degree of culpability based upon his inability to formulate the requisite mental state. *See Hughes,* 581 Pa. at 319, 865 A.2d at 788 (citing *Commonwealth v. Jones,* 539 Pa. 222, 238, 651 A.2d 1101, 1109 (1994)). Given this foundation, where a defendant has denied committing a crime during his trial testimony, this Court has refused to find counsel ineffective for failing to present a defense that would have conflicted with such testimony. *See, e.g., Commonwealth v. Spotz,* 587 Pa. 1, 47, 896 A.2d 1191, 1218 (2006); *Hughes,* 581 Pa. at 319–20, 865 A.2d at 788; *Commonwealth v. Williams,* 577 Pa. 473, 483, 846 A.2d 105, 111 (2004); *Paolello,* 542 Pa. at 79, 665 A.2d at 455.

In this regard, we agree with the PCRA court's assessment of Appellant's testimony. Although Appellant admitted at trial to being at the bar on the night in question, he denied firing a weapon. For example, one exchange with counsel proceeded as follows:

Q: Did you' kill anybody or did you fire any shots in the bar that night?

A: No, I didn't kill anybody and I didn't fire any shots.

N.T. October 7, 1991, at 114; *see also id.* at 88, 112. Similarly, Appellant expressly denied participating in or agreeing to the robbery:

Q: Had you made any efforts to rob anybody in the bar?

A: No, I had not.

Q: Had you any conversation with Tancemore or David Green about robbing anybody inside the bar?

A: No, I didn't.

*Id.* at 90. In addition, Appellant attempted to implicate Tancemore and Green as the actual perpetrators. *See id.* at 87–89. Thus, upon review of the record, it is apparent that Appellant did not admit liability for the murders in any fashion, but rather asserted his own innocence. As such, trial counsel cannot be faulted for failing to present evidence of diminished capacity in light of his client's own contrary testimony. *See, e.g., Spotz,* 587 Pa. at 47, 896 A.2d at 1218; *Hughes,* 581 Pa. at 319–20, 865 A.2d at 788.[17]

Appellant places significant reliance on his claim that trial counsel did not adequately investigate a potential diminished capacity or voluntary intoxication defense. He argues that such a failure precludes application of the precept that trial counsel will not be held ineffective when a diminished capacity defense, premised upon an admission of liability, would conflict with his client's sworn testimony. However, whether addressing a claim of counsel's failure to investigate or failure to present such defenses, this Court has employed the same analysis. *See, e.g., Commonwealth v. Williams,* 577 Pa. 473, 483–84, 846 A.2d 105, 112 (2004) ("Moreover, *even if counsel had thoroughly investigated Appellant's past,* the presentation of a diminished capacity defense would have directly contradicted Appellant's assertions that someone else had committed the crime, and thus would not have been an available defense." (emphasis added)).

17. Recently, this author indicated that he would be receptive to reconsidering the restrictions upon alternative defenses upon the advancement of arguments grounded in the theoretical underpinnings. *See Spotz,* 587 Pa. at 107–08, 896 A.2d at 1254–55 (Saylor, J., concurring and dissenting). However, Appellant's contentions are not developed in such a fashion in this case, and, moreover, counsel cannot be deemed ineffective for acceding to a well-entrenched restriction on the available defenses. *Accord id.* at 108, 896 A.2d at 1255.

## F. Failure to Present Witnesses

■ Appellant argues that trial counsel was ineffective for failing to locate and present witnesses who could have implicated Green in the murders. Specifically, Appellant asserts that a witness would have testified that he had observed Appellant, Tancemore and Green drinking together at a different bar before the murders occurred, *see* Declaration of Lamont Reddick, ¶ 2, that Appellant was extremely intoxicated upon leaving that bar, *see id.* at ¶ 6–7, and that he knew Green to carry a .45 caliber handgun, *see id.* at ¶ 5. Appellant also asserts that counsel should have presented testimony from another witness, who knew that Green generally carried a .45 caliber handgun, while Appellant, when he was armed, carried a .38 caliber weapon, *see* Declaration of Terrance Broadwater, ¶ 8, and that Tancemore and Green had previously committed armed robberies together, *see id.* at ¶ 7. Finally, Appellant contends that a bar patron on the night of the killings would have testified that:

3. ... Not long after I got to Woody's, Greg [Tancemore] walked in with two other men. One was short and the other was tall. After a while, the short guy walked to the rear of the bar and went in the bathroom. The other two men stayed near the front of the bar.

4. All of a sudden you could hear a lot of commotion from the rear of the bar where the short guy had went. I turned around and heard a guy at the bar shout something, it turned out to be the police officer at the bar who got shot, and Greg and the other guy standing at the front pulled out guns and started shooting at him. As soon as I heard the shots, I like everyone else in the bar, dropped to the floor. It was very dark and there was a lot of commotion, but I am very sure that I saw Greg and the tall guy standing near him shoot at the police officer.

5. I saw the short guy who went to the back of the bar run out the front door of the bar. I did not see him shoot the cop or the woman.

Declaration of Therion Moss, ¶ 3–5 (Sept. 2, 1998). This witness would also have explained that he had identified

Appellant as "the short guy" upon meeting him in jail. *See id.* at ¶ 8.

Appellant maintains that trial counsel's failure to make a reasonable effort to contact these witnesses was not the result of any strategy and prejudiced his defense because the presentation of such testimony would have cast doubt on the Commonwealth's theory of the case, particularly as, in Appellant's view, the descriptions of the second shooter elicited at trial could have easily applied to Green and the ownership of the .45 caliber handgun was vigorously contested. Further, Appellant contends that the statements of these witnesses contradict evidence proffered by the Commonwealth at trial and therefore would have presented a question of credibility for the jury to resolve. *See Commonwealth v. Spotz,* 552 Pa. 499, 510, 716 A.2d 580, 585 (1998). Appellant asserts that appellate counsel's failure to raise this issue on direct appeal was also the result of ineffective assistance.

▬ To demonstrate the arguable merit of his underlying claim that his trial counsel was ineffective in failing to present additional witnesses, Appellant must establish "the existence of and the availability of the witnesses, counsel's actual awareness, or duty to know, of the witnesses, the willingness and ability of the witnesses to cooperate and appear on the defendant's behalf and the necessity for the proposed testimony in order to avoid prejudice." *Commonwealth v. Spotz,* 587 Pa. 1, 48, 896 A.2d 1191, 1219 (2006) (quoting *Commonwealth v. Whitney,* 550 Pa. 618, 638, 708 A.2d 471, 480 (1998)). Moreover, Appellant must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case. *See Commonwealth v. Chmiel,* 585 Pa. 547, 622, 889 A.2d 501, 546 (2005) (citing *Commonwealth v. Beasley,* 544 Pa. 554, 566, 678 A.2d 773, 778 (1996)); *Commonwealth v. Auker,* 545 Pa. 521, 548, 681 A.2d 1305, 1319 (1996). Because we conclude that Appellant has not established prejudice arising out of the absence of the witnesses' testimony or that such evidence would have been beneficial to his defense, even if believed, we find no error in the PCRA court's decision to dismiss this claim.

First, any proposed testimony related to Appellant's consumption of alcohol on the night of the murders only would have been beneficial had Appellant pursued a diminished capacity or voluntary intoxication defense at trial, which, as developed above, counsel was not ineffective for failing to present, in view of Appellant's trial testimony asserting his innocence of the crime. Further, the evidence concerning whether Green or Appellant was known to carry a .45 caliber handgun would have been cumulative of testimony presented at trial, *see* N.T. October 7, 1991, at 222–24, 234–35 (reflecting testimony that Green carried a .45 caliber handgun, while Appellant carried a .38), and, in any event, does not identify any particular weapon as that carried by either person on the night of the killings. As this Court has explained, trial counsel will not be found ineffective for failing to call a witness whose testimony would be cumulative. *See Commonwealth v. Meadows*, 567 Pa. 344, 359, 787 A.2d 312, 320 (2001).

Moreover, none of the evidence of Green's possible involvement in the murders proffered by Appellant in his PCRA petition directly contradicts the Commonwealth's presentation at trial. Significantly, the fact that Tancemore and Green had previously committed robberies together, even if accepted as true, does not imply that Appellant was not involved on this occasion, particularly as another proposed witness would have testified that Appellant left in the company of both Tancemore and Green, *see* Reddick Declaration, ¶ 7, and Appellant himself admitted that he had been at the bar on the night of the murders, *see* N.T. October 7, 1991, at 81–82. Similarly, the statement of a witness indicating that he did not see Appellant shooting at the bar does not demonstrate that Appellant did not fire a weapon; rather, in the absence of any indication that the witness's view of Appellant was uninterrupted, it simply reflects that the witness did not make such an observation. In addition, as both the Commonwealth and the PCRA court noted, the testimony of the witnesses could have been impeached with their prior convictions for several robberies, a *crimen falsi* offense. *See Gibson*, No. 2809, January Term, 1991, *slip op.* at 4 (1/8/2001); Brief for Appellee at 54. Thus,

considering the evidence presented at trial, including Appellant's statement to the detectives admitting participation in the murders and the testimony of several eyewitnesses positively identifying Appellant as one of the perpetrators, *see, e.g.,* N.T. October 3, 1991, at 116–17, 124–25; N.T. October 4, 1991, at 48; N.T. October 7, 1991, at 53–54, we conclude that the PCRA court did not err in dismissing this claim, despite the evidentiary proffer.

### G. Ballistics Evidence

Appellant next contends that trial counsel was ineffective for failing to challenge "ballistics" evidence introduced at trial. Appellant argues that such evidence was inconclusive and, if effectively challenged, could have raised a reasonable doubt as to Appellant's guilt. In this regard, Appellant asserts that the trial testimony established that three weapons had been fired at the bar—a nine millimeter, a .45 caliber and Officer Duke's pistol—and that no one testified definitively that Appellant possessed the .45 caliber handgun on the night of the murders. Given these uncertainties, Appellant argues that trial counsel's admitted failure to obtain a copy of the "ballistics report," *see* N.T. October 3, 1991, at 179, and retain an expert, as well as counsel's failure to object to testimony indicating that one bullet could not be linked to a particular weapon due to its passage through someone's head, *see* N.T. October 4, 1991, at 179–80, could not be the result of a reasonable strategy and prejudiced Appellant. Because this claim was not raised on direct appeal, Appellant also asserts that appellate counsel rendered ineffective assistance.

As the Commonwealth observes, Appellant's arguments are premised upon an inaccurate reading of the record. The "ballistics report" to which Appellant refers was, in fact, a Mobile Crime Detection service report, listing items recovered at the scene, describing such items, and including photographs of the scene.[18] *See* N.T. October 3, 1991, at 179. Moreover,

18. According to the Commonwealth, the Mobile Crime Detection Unit gathers evidence but does not perform any ballistics testing. Instead, the results of such tests are reported by a ballistics expert, a function

when trial counsel requested a copy of this report, which had been used to refresh a witness' recollection, the prosecutor explained that a copy of the document had already been provided to the defense. *See id.* In addition, the record supports the conclusion that, contrary to Appellant's assertions, only two weapons had been fired at the bar on the night of the murders, a nine millimeter, and a .45 caliber handgun. *See* N.T. October 4, 1991, at 172–73. Further, the off-duty bouncer expressly testified that Appellant possessed a .45 caliber handgun, *see* N.T. October 3, 1991, at 123, and Appellant does not mention his own statement to the detectives wherein he admits possessing and shooting such a weapon, *see* N.T. October 7, 1991, at 54. Finally, the Commonwealth's ballistics expert testified that the .45 caliber bullets and cartridge casings recovered from the scene were fired from the pistol that was traceable to Appellant. *See* N.T. October 4, 1991, at 183–92.

Although Appellant is correct that one witness testified that a bullet passed through a person's head, an event which did not actually occur, any potential prejudice caused by this brief remark was mitigated by the medical examiner's testimony indicating that both victims had been shot only in the arms and chest. *See* N.T. October 7, 1991, at 9–12. Additionally, the bullet to which this comment referred was fired from a nine millimeter handgun, *see* N.T. October 4, 1991, at 179–80, a weapon the Commonwealth did not attempt to place in Appellant's possession. Moreover, the issue at trial was not the physical location of the victims' wounds, but rather who fired the shots in the first instance, a question that the referenced report cannot answer. Appellant also does not specify how trial counsel's further challenge of the report would likely have altered the outcome of his trial.

### H. Continuance to Locate a Witness

Appellant argues that the trial court erred in denying his request for a continuance to locate a witness, Dr. Olu

performed by Officer James O'Hara in the present case. *See* N.T. October 4, 1991, at 162–200.

Fadeyibi, who failed to appear at trial.[19] Appellant asserts that the voluntariness of his confession was a key issue for his defense; that several witnesses testified at trial that Appellant had appeared injured at his arraignment; and that Dr. Fadeyibi, who was a legal intern employed by the Defender Association of Philadelphia and represented Appellant at his arraignment, testified at the suppression hearing concerning his observations of Appellant's injuries. The PCRA court did not consider the merits of this claim, concluding that it had been previously litigated on direct appeal, *see* 42 Pa.C.S. § 9544(a), and observing that Appellant could not overcome such limitation by presenting new theories of relief to support his previously litigated claim. *See Commonwealth v. Senk*, 496 Pa. 630, 635–636, 437 A.2d 1218, 1220 (1981); *see also Commonwealth v. Peterkin*, 538 Pa. 455, 460–61, 649 A.2d 121, 123 (1994) ("[P]ost-conviction review of claims previously litigated on appeal cannot be obtained by alleging ineffective assistance of prior counsel and by presenting new theories of relief to support previously litigated claims."). Relying on *Commonwealth v. Miller*, 560 Pa. 500, 519 n. 9, 746 A.2d 592, 602 n. 9 (2000), however, Appellant argues that this issue cannot be deemed previously litigated, as he has now set forth previously unchallenged evidence that this Court did not consider on direct appeal. Further, Appellant maintains that appellate counsel's presentation of this issue was ineffective, as counsel failed to include "evidence that would have placed Appellant's claim in context," *see* Brief of Appellant at 49, including the declarations provided to the PCRA court.

This Court has recently determined that the ineffective assistance of counsel raises a claim distinct from the underlying allegations of trial court error, given its basis in Sixth Amendment principles. *See Commonwealth v. Collins*, 585 Pa. 45, 60–61, 888 A.2d 564, 573 (2005). In the present matter, on direct review Appellant challenged the trial court's refusal to grant him a continuance to locate Dr. Fadeyibi, the same claim underlying his present assertion of deficient stew-

19. Although the proper spelling of Dr. Fadeyibi's name appears to be in question, we will use the version presented most often.

ardship. Appellate counsel's arguments in this regard, though brief, centered around Dr. Fadeyibi's prior testimony and the necessity of having a neutral witness testify concerning his injured appearance at his arraignment. Although Appellant's present arguments focus on similar contentions, Appellant also includes allegations of counsel's ineffectiveness, thereby advancing a distinct claim that may be reviewed on its merits.

Appellant's ineffectiveness claim, however, fails on the arguable merit prong for the reasons noted on direct appeal, namely, that it was not an abuse of discretion for the trial court to deny Appellant a continuance to locate Dr. Fadeyibi, as his testimony would have been cumulative of the testimony of five other witnesses. *See Gibson*, 547 Pa. at 90–91, 688 A.2d at 1161–62; *see also Collins*, 585 Pa. at 61, 888 A.2d at 573 ("Ultimately, the claim may fail on the arguable merit or prejudice prong for the reasons discussed on direct appeal, but a Sixth Amendment claim raises a distinct issue for purposes of the PCRA and must be treated as such."). Notably, Appellant has not explained precisely what evidence appellate counsel was ineffective for failing to present and has failed to proffer any evidence connected to this particular claim that was not also presented on direct appeal, aside from general statements concerning the appropriate "context" of this claim. Indeed, the only citation Appellant provides in this respect is to the portion of his own brief detailing declarants' descriptions of his intoxication on the night of the murders. *See* Brief of Appellant at 49 (citing Brief of Appellant at 24–25). However, such evidence has no bearing on the trial court's denial of his motion for a continuance to locate a cumulative witness, and, accordingly, the PCRA court did not err in dismissing this claim.

## I. Police Presence

Appellant argues that the presence of numerous uniformed police officers in the courtroom and surrounding areas during the guilt and penalty phases of his trial created an inherently prejudicial atmosphere thereby depriving him of a fair trial. *See Holbrook v. Flynn*, 475 U.S. 560, 570–71, 106

S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986) ("We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial."). Appellant supports this contention by observing that both the Commonwealth and defense counsel noted the officers' presence on the record, *see* N.T. October 8, 1991, at 98–99, 131–32, and with numerous declarations from persons present at trial, which he claims demonstrate the overwhelming numbers of police present in the courtroom and their effect on the jury, *see* Declaration of Karim Shabazz, ¶ 10–11; Declaration of Leora Johnson, ¶ 10 (Aug. 11, 1999); Declaration of Niema Williamson, ¶ 11 (Aug. 12, 1999) ("Williamson Declaration"); Declaration of Kevin Bryant, ¶ 5–7 (Aug. 13, 1999); Declaration of Joan Gibson, ¶ 15 (Mar. 2, 1999). Appellant analogizes the present matter to *Norris v. Risley,* 918 F.2d 828, 833 (9th Cir.1990), in which the United States Court of Appeals for the Ninth Circuit stated that an implied message, which may impact the fairness of the proceedings, is "all the more dangerous precisely because it was not a formal accusation." As such, "the accusation stood unchallenged, lending credibility and weight to the state's case without being subject to the constitutional protections to which such evidence is ordinarily subjected." *Id.* Appellant further asserts that previous counsel were ineffective for failing to object at trial and failing to raise this claim on direct appeal.

In response, the Commonwealth observes that courts must be open to the public, *see Commonwealth v. Contakos,* 499 Pa. 340, 343, 453 A.2d 578, 579 (1982); *Richmond Newspapers v. Virginia,* 448 U.S. 555, 573, 100 S.Ct. 2814, 2825, 65 L.Ed.2d 973 (1980), and that police are expected to be present during the trial of one accused of murdering a fellow officer, *see Smith v. Farley,* 59 F.3d 659, 664 (7th Cir.1995) (noting that "if you kill a policemen [sic] and are put on trial for the crime, you must expect the courtroom audience to include policemen"). The Commonwealth further explains that a courtroom condition will not inherently prejudice a defendant's right to a fair trial unless it is demonstrated that "an unacceptable risk is presented of impermissible factors coming into play." *Hol-*

*brook,* 475 U.S. at 570, 106 S.Ct. at 1346–47 (quoting *Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976)). The Commonwealth emphasizes that there is no evidence of the number of uniformed police officers who attended Appellant's trial and no indication that those officers disrupted the proceedings in any fashion. In addition, the Commonwealth distinguishes *Norris,* as the situation in that case involved spectators wearing buttons with the words "Women Against Rape," which the court believed impliedly accused the defendant of the crime with which he was charged. *See Norris,* 918 F.2d at 829. Thus, the Commonwealth contends that, as the PCRA court concluded, the presence of police officers in the courtroom during Appellant's trial was not inherently prejudicial.

We agree with the Commonwealth and the PCRA court that Appellant's proffer was insufficient to demonstrate that his contentions with respect to the presence of police officers at his trial might have arguable merit. The only record evidence of the officers' presence is contained within the arguments of defense counsel and the prosecutor.

> If we took all of these police officers off and put them on the streets where they should be, because this case is over and their only interest in the case at this point should be to go find and solve crimes someplace else, but they are here. They are here and they are here in uniform. And their purpose for being here, I suggest to you, is to play on your sympathy because a fellow officer is dead and to intimidate you by daring you to consider the defense in this case at all, or to suggest as you sit here that they and the people who talk to them are in fact telling the truth ...
>
> * * *
>
> ... So what do they do to you on the day when I have to talk to you and when he has to talk to you and the Judge is going to tell you what the law is and you are going to take the case out? They fill up the courtroom with cops, and the effort is to deal with your mind in a fashion where you

would be persuaded to consider the evidence in this case in consideration of who died.

N.T. October 8, 1991, at 98–99 (closing arguments of defense counsel).

[Defense counsel] talked about the presence of police officers here and none of those people are here because they have to be, and he submits to you there is a reason for their presence here. Well, I submit to you they are here because a fellow officer was killed, much the same way that persons from any particular profession who have an affinity, comradeship with each other would appear in circumstances such as this. This does not come close to the number of persons present at his funeral but that is all the room will hold, and they are here because they care.

But the thing I really want to say about that is this: This case exists before you now and Mr. Gaskins said what he said about an angle for why we are here, because Officer Dukes has been referred to time and time and time again as Officer Dukes, but he is a human being and I would be here were it not Officer Dukes involved in this case, if only Vernae Nixon were involved in this case, because she is a person too. And it is a tragedy that Mr. Gaskins said nothing about her.

N.T. October 8, 1991, at 131–32 (closing arguments of prosecutor). These brief references, tempered by the assistant district attorney's statement that the case would still be prosecuted if no police officer had been killed, *see id.* at 132, do not create an unacceptable risk that the jury would consider impermissible factors in reaching its verdict and sentence. *See Holbrook,* 475 U.S. at 570, 106 S.Ct. at 1346–47. Moreover, the declarations proffered by Appellant, from his friends and family members, do not establish that the jury was intimidated by the unknown number of police officers present in the courtroom. The defense investigator, for example, states that "[t]he courtroom was packed by police officers throughout the trial," but concedes that only some were in uniform. *See* Shabazz Declaration, ¶ 10. Further, several declarations proffered by Appellant indicated that the police

would make noises in favor of the prosecution and against the defense, but Appellant has not identified any portion of the record that would substantiate these statements. *See* Shabazz Declaration, ¶ 11; Johnson Declaration, ¶ 10; Williamson Declaration, ¶ 11; Bryant Declaration, ¶ 6–7; Gibson Declaration, ¶ 15.[20]

In addition, we find *Smith* to be more analogous to the present matter than *Norris*. In *Smith*, the Seventh Circuit directly addressed the effect of a prosecutor's reference to the presence of police officers and, recognizing the potential for intimidation posed by such spectators, concluded that brief statements and an unknown number of officers did not deny the defendant a fair trial. *See Smith*, 59 F.3d at 664–65. Similarly, we acknowledge that police officers' attendance at trial may cause concern with regard to jurors' perceptions and courtroom atmosphere. However, where the record does not indicate the number of uniformed officers present or any disturbance caused thereby, we conclude that Appellant cannot demonstrate that an unacceptable risk of the jury considering impermissible factors was created. *Cf. Meadows v. State*, 785 N.E.2d 1112, 1123–24 (Ind.App.2003) (finding no abuse of discretion in permitting up to ten uniformed police officers to attend the defendant's trial); *Brown v. State*, 132 Md.App. 250, 752 A.2d 620, 631 (2000) (holding that the presence of an unknown number of uniformed officers, without more, did not sufficiently demonstrate that the defendant was

**20.** We recognize the declarations, as they concern disruptive behavior, if believed, would establish a significant irregularity in the proceedings. In such circumstances, this author has generally favored an evidentiary hearing to resolve the credibility issue. *See, e.g., Commonwealth v. Carson*, 590 Pa. 501, 616–18, 913 A.2d 220, 288–89 (2006) (Saylor, J., dissenting); *Commonwealth v. Bryant*, 579 Pa. 119, 162–64, 855 A.2d 726, 751–52 (2004) (Saylor, J., dissenting). However, a majority of the Court has sanctioned the dismissal of claims which might involve credibility in light of implausibility and based on conclusions drawn from the existing record. *See Bryant*, 579 Pa. at 154–57, 855 A.2d at 748; *see also* Carson, 590 Pa. at 556–57, 913 A.2d at 251–52. Here, it seems implausible that the sort of disruptive behavior described in the post-conviction declarations would have gone unnoticed by Appellant's trial counsel or the trial court, and, where there is no record concerning such behavior, dismissal of this claim is consistent with the approach of the *Bryant* and *Carson* majorities.

denied a fair trial); *State v. Hill,* 501 S.E.2d 122, 126 (S.C. 1998) ("[W]ithout anything more than the mere assertion that six officers were present in the courtroom, we cannot find appellant has shown any inherent prejudice."). Accordingly, the PCRA court correctly determined that this was not a circumstance in which Appellant demonstrated that he was prejudiced by the officers' attendance at his trial, and his ineffectiveness claim fails.

## J. Fingerprints

Appellant argues that the Commonwealth destroyed potentially favorable forensic evidence in the form of fingerprints on the alleged murder weapon in violation of Appellant's right to due process. *See Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). Appellant observes that Detective Richard Bova testified at trial that he did not preserve the .45 caliber handgun seized from Green's apartment for fingerprints, *see* N.T. October 4, 1991, at 143–44, which, in Appellant's view, demonstrates the willful failure of police to preserve exculpatory evidence. In addition, Appellant contends that the PCRA court improperly relied on *Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666 (1999), in dismissing this claim, as that case involved a failure to record preliminary conversations with several witnesses rather than the failure to preserve physical evidence. Appellant also asserts that prior counsel were ineffective for failing to raise this claim previously.

We agree with the PCRA court that Appellant is not entitled to relief on this claim, as his proffer does not demonstrate bad faith on the part of the police, a showing required to obtain relief under *Youngblood. See Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Significantly, Appellant has not attempted to establish that fingerprint evidence existed, instead confining his argument to mere assertions that his own fingerprints were not present on the

weapon and the possibility that another person's fingerprints would be discovered. *Cf. Illinois v. Fisher,* 540 U.S. 544, 549, 124 S.Ct. 1200, 1203, 157 L.Ed.2d 1060 (2004) (*per curiam*) (emphasizing that *Youngblood's* bad faith requirement applies to evidence that is, "at best, potentially useful"). Further, the Supreme Court has recognized that the police are not constitutionally required to perform specific forensic tests on evidence collected. *See Youngblood,* 488 U.S. at 59, 109 S.Ct. at 338. Notably, the lack of fingerprint testing was not concealed from Appellant at trial, and he was free to argue that such tests would have revealed exculpatory evidence. *Cf. id.* at 59, 109 S.Ct. at 338 ("The situation here is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests.").

In addition, while Appellant is correct that *Small* concerned the police's failure to create a record of verbal communications with various witnesses rather than the failure to preserve physical evidence, we do not believe that such a distinction renders that case inapplicable. In *Small,* this Court determined that the defendant could not demonstrate bad faith in a situation where there was no indication that the allegedly unpreserved evidence existed, the police had no reason to know of the future use of such conversations, and the potential exculpatory value of the evidence was not apparent before it was lost or destroyed. *See Small,* 559 Pa. at 441–42, 741 A.2d at 676. In the present matter, the record indicates that the handgun in question was located two days after the murders inside a paper bag, underneath some clothing, in a bureau in Green's apartment, and that Appellant had previously hidden the gun under Green's mattress. *See* N.T. October 4, 1991, at 130–31; N.T. October 7, 1991, at 53–54. Upon recovery of the weapon, the police may have known that the weapon itself would be used as evidence at Appellant's trial, but the value of any fingerprints, had they been present, may not have been immediately apparent particularly in light of the passage of

several days' time since the killings. More important, it is not likely that the police anticipated that any fingerprints that were discovered on the handgun would have been exculpatory. *See Small,* 559 Pa. at 442, 741 A.2d at 676 (citing *California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984), for the proposition that no constitutional duty to preserve evidence arises unless the evidence "might be expected to play a significant role in the suspect's defense" and "possess[es] an exculpatory value that was apparent before the evidence was destroyed"). Thus, although it may have been negligent for the police, believing that the weapon had been used in the murders, to have failed to preserve the evidence such that fingerprint tests could be conducted, these circumstances alone, and absent more than Appellant's assertions, do not demonstrate the requisite bad faith on the part of the police. *Cf. Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337 (concluding that there was no suggestion of bad faith and noting that "[t]he failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent").

### K. Jury Instructions

Appellant first contends that he is entitled to a new trial because, in its charge to the jury on the element of specific intent, the trial court relieved the Commonwealth of its burden to prove every element of first-degree murder beyond a reasonable doubt, in violation of the Fourteenth Amendment Due Process Clause. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Commonwealth v. Wayne,* 553 Pa. 614, 632, 720 A.2d 456, 464 (1998). The challenged instruction reads:

First degree murder is a murder in which the killer has the specific intent to kill. You may find the defendant guilty of first degree murder if you are satisfied that the following three elements have been proven beyond a reasonable doubt:

First, that Frederick Dukes and Vernae Nixon are dead.

Second, that the defendant killed Frederick Dukes and Vernae Nixon.

And third, that the defendant did so with the specific intent to kill and with malice.

A person has the specific intent to kill, if he has fully formed the intent to kill and is conscious of his own intention. As my earlier definition of malice indicates, a killing of a person by a person who has the specific intent to kill is a killing with malice, provided also that it is without circumstances reducing the killing to voluntary manslaughter. Stated differently, a killing is with specific intent to kill if it is willful, deliberate and premeditated.

The specific intent to kill, including the premeditation needed for first degree murder, does not require planning or previous thought or any particular length of time. It can occur quickly. All that is necessary is that there be time enough so that the defendant can and does fully form an intent to kill and is conscious of that intention.

When deciding whether the defendant had the specific intent to kill, you should consider all of the evidence, including his words and conduct and the attending circumstances that may show his state of mind. If you believe that the defendant intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill.

N.T. October 8, 1991, at 158–60. Appellant asserts that, by combining the first-degree murder charge to encompass the murder of both victims, the jury was allowed to convict Appellant of the first-degree murder of both Officer Dukes and Ms. Nixon if it found that he had the specific intent to kill either victim. This defect is compounded, Appellant argues, by the court's failure to adequately explain the distinction between accomplice liability and conspiracy, *see id.* at 172 ("He is an accomplice if with the intent of promoting or facilitating the commission of the crime, he solicits, commands, encourages, requests the other person to commit it, or he aids, agrees to aid or attempts to aid the other person in planning

or committing it."), and by the court's instruction on conspiracy to commit robbery but not conspiracy to commit murder, *see id.* at 169 ("In order to find the defendant guilty of conspiracy to commit robbery, you must be satisfied initially that the two elements of a conspiracy have been proven beyond a reasonable doubt ..."). Appellant further asserts that trial counsel was ineffective for failing to object to these instructions and that appellate counsel was ineffective for failing to raise the claim on direct appeal.

Jury instructions are to be evaluated as a whole, *see Commonwealth v. Hawkins,* 567 Pa. 310, 326, 787 A.2d 292, 301 (2001), and the trial court possesses broad discretion in phrasing such instructions, so long as the directions as given "clearly, adequately, and accurately" reflect the law, *see id.* (citing *Commonwealth v. Prosdocimo,* 525 Pa. 147, 150, 578 A.2d 1273, 1274 (1990)). Viewing the challenged charge in light of this standard, we agree with the PCRA court that the instruction accurately apprised the jurors of the applicable law and did not imply that a finding of specific intent to kill one victim would suffice to convict Appellant of the first-degree murder of both victims. Notably, when referring to the element of specific intent, the trial court utilized the singular form of certain important words. *See* N.T. October 8, 1991, at 159 ("a killing of *a person* by a person who has the specific intent to kill" (emphasis added)); *id.* at 159–60 ("intentionally used a deadly weapon on a vital part of *the victim's* body" (emphasis added)). This Court has not required trial courts to provide essentially duplicate jury instructions on the same offense for separate victims, and the instructions given in the present matter sufficiently informed the jury of each element necessary to return a verdict of first-degree murder with respect to each victim.

Appellant next argues that trial counsel was ineffective for failing to request a jury instruction directing that his statement to the police could only be considered against him if it had been given voluntarily. Because, under Pennsylvania law, defendants have the right to present evidence concerning the voluntariness of any statements made to the police at trial,

Appellant asserts that a jury is not permitted to consider the defendant's statement unless and until it makes an independent finding that such confession was voluntary. *See Commonwealth v. Cunningham,* 471 Pa. 577, 591, 370 A.2d 1172, 1179 (1977) ("[T]he defendant is permitted to introduce evidence at trial relating to the voluntariness of a challenged statement. When a jury is so confronted it may not assess the evidentiary weight to be given to the evidence until it first makes an independent finding that the confession was voluntarily made."); *Commonwealth v. Coach,* 471 Pa. 389, 394, 370 A.2d 358, 361 (1977) ("The issue of voluntariness is properly before a suppression court and also is a proper trial issue for the factfinder. The factfinder at trial cannot consider the confession as evidence if he factually determines that it was involuntarily given by the defendant.").

The two cases referenced by Appellant in support of his argument do not stand for a broad mandate that a jury instruction concerning the voluntariness of a defendant's statement must be given in every case where such evidence is presented. Indeed, *Cunningham* involved a trial judge's determination of relevancy with regard to certain evidence that the defendant sought to introduce to establish that his statement was involuntary. *See Cunningham,* 471 Pa. at 592, 370 A.2d at 1179 (holding that evidence of coercive circumstances surrounding a prior statement was properly deemed irrelevant where the statement challenged by the defendant had been "purged of any prior illegality"). Further, although the Court in *Coach* awarded a new trial due to the failure to give a requested jury instruction, that instruction involved the jury's consideration of the unnecessary delay between the defendant's arrest and arraignment as a factor in its assessment of the voluntariness of his confession. *See Coach,* 471 Pa. at 396–97, 370 A.2d at 362.

In any event, it is also clear that, as the PCRA court concluded, Appellant has not demonstrated prejudice arising out of the absence of a voluntary statement instruction. The purport of Appellant's presentation was that his statement was untrue as it was coerced, *see, e.g.,* N.T. October 7, 1991, at

99–106, 169–72, 181–82, 193, 202, and the jurors were free to accept this proposition had they credited Appellant's evidence. Even if the jury had disregarded Appellant's confession in its entirety in light of his evidence, given the extent of the evidence demonstrating his guilt, including eyewitness testimony correlated with the physical evidence, *see, e.g.,* N.T. October 3, 1991, at 78–79, 116–17, 124–25; N.T. October 4, 1991, at 48, 192; N.T. October 7, 1991, at 12–13, 53–54, there is no reasonable probability that the outcome of Appellant's trial would have been different. *See Commonwealth v. Pierce,* 567 Pa. 186, 203, 786 A.2d 203, 213 (2001).

## L. Asserted Prosecutorial Misconduct

Having raised claims of prosecutorial misconduct on direct appeal based upon the prosecutor's allegedly improper closing arguments, *see Gibson,* 547 Pa. at 94–98, 688 A.2d at 1164–65, Appellant now challenges different portions of those arguments and additional conduct of the prosecutor. First, Appellant contends that the prosecutor "denigrated" Appellant, his counsel, certain defense witnesses, and his constitutional rights. Among his claims in this regard, Appellant complains that the district attorney improperly complained about his obligation to disclose material evidence to the defense, disparaging the defense because no reciprocal obligation exists, *see* Brief for Appellant at 58 (citing N.T., October 8, 1991, at 124–25 (reflecting the district attorney's statement, during closing arguments, that, "I have the obligation of providing all of the documentation I have to counsel well prior to trial ... but there is no reciprocal agreement.")); improperly "vouched" for witnesses who supported his case and personally attacked the credibility of adverse witnesses, *see id.* at 58–59 (citing N.T. October 3, 1991, at 115 (on redirect examination, asking the barmaid, "Were you doing the best you could under the circumstances to tell them what happened?" and "Did I ever ask you to say anything particular at all?")); denigrated the defense, *see id.* at 59–60 (citing N.T. October 7, 1991, at 162 (cross-examining Appellant and stating, "It must have been when you were in the men's room [Tancemore] said to [Green], You know, [Appellant] doesn't

curse anymore so let's not shoot while he's out here, let's rob the bar while he's in the men's room."); N.T. October 3, 1991, at 119 (asking the barmaid witness, "Did I ever come to your bar and bring an obnoxious person with me?," referring to Attorney Gaskins)); misled the jurors by falsely suggesting that Appellant had testified at a prior hearing that he had never been at the scene of the crimes at all, *see id.* at 60 (citing N.T. October 7, 1991, at 134); introduced improper victim-impact evidence, *see, e.g., id.* at 60–62 (citing N.T. October 3, 1991, at 82 (eliciting testimony from the barmaid that Officer Dukes had purchased rounds of drinks for other bar patrons before the shooting); N.T. October 4, 1991, at 11 (eliciting testimony from an individual who rode to the hospital with Officer Dukes, concerning the victim's thoughts about his wife and children, desire not to die, and feelings of cold)); [21] and made improper victim-impact arguments, *see id.* at 61 (citing, *e.g.,* N.T., October 8, 1991, at 154 ("[W]hat you can do and what you must do is deliver the only remaining call [the victims] have upon anyone on this earth, and that is a call for justice, because you can't return to sons their father or to a wife her husband or to a daughter her mother.")).[22]

**21.** Appellant's trial occurred prior to 1995 amendments to the death-penalty statute permitting evidence concerning the victim and the impact that the victim's death had on his or her family to be admitted in a capital sentencing hearing. *See* 42 Pa.C.S. § 9711(a)(2). Therefore, the amendments are inapplicable here. *See Commonwealth v. Fisher,* 545 Pa. 233, 264 n. 7, 681 A.2d 130, 145 n. 7 (1996).

**22.** The relevant passages of Appellant's brief are cluttered with other brief assertions of misconduct. For example, Appellant complains that the prosecutor told the jurors that Appellant was going to follow the off-duty bouncer into the men's room "and neutralize him." *See* Brief for Appellant at 57 (citing N.T., October 3, 1991, at 27–28). Appellant interprets this reference as an unsupported assertion that Appellant intended to kill the bouncer. However, Appellant's own statement to police was evidence that he intended to hold the bouncer at gunpoint. *See* N.T., October 7, 1991, at 41 ("[T]ancemore had told me that he wanted me to hold the guy selling the powder in the bathroom point of gun."). The prosecutor's reference to "neutralizing" the bouncer is consistent with this evidence and is not an obvious indication of an intent to kill.

It is too cumbersome to address each of Appellant's brief references of this sort on their specific terms, and therefore, those that are not

Relative to the penalty phase, Appellant contends that the prosecutor's closing statement was an "appeal to vengeance," that was "directed to passion and prejudice rather than an understanding of the facts and the law." *See* Brief for Appellant at 66 (citing *Lesko v. Lehman,* 925 F.2d 1527, 1545 (3d Cir.1991)). Appellant asserts that the district attorney's penalty-phase closing contained further improper references to victim impact and improperly conveyed impressions about the sentence that the victims' families desired. *See id.* at 67–69 (citing N.T. October 8, 1991, at 48 (reflecting the prosecutor's comment to the jurors that, "When you think of sympathy, look to the front row here[;][w]hen [Appellant] says people liked him, look to the front row here"); N.T. October 8, 1991, at 54 ("[W]hat [Appellant] did will reverberate through the lives of those who knew his victims into the next century.... You heard pain in this courtroom yesterday; it affected you just as it affected some of us. Think if that pain equaled the pain felt by persons on December 25 at the morgue, think of their pain."); N.T., October 8, 1991, at 55 ("If the words existed to give Mrs. Dukes a husband, not a tragic memory, to give their sons a father, not tears on a holiday, if the words existed to give Mrs. Nixon a daughter, not heartache, I would call upon you to say them, but they don't exist. I call upon you to give them justice.")). Further, Appellant complains that the district attorney told the jurors that it was their duty to sentence Appellant to death. *See id.* at 69 (citing N.T. October 8, 1991, at 52–53 ("In the long run the most difficult task you ever will have will be to face yourself if you fail to do your duty as jurors and citizens of the human race.")). Appellant also asserts that the prosecutor improperly asked the jury to consider an aggravating factor that was never charged, namely, Appellant's decision to kill "because of his desire not to be held responsible for his acts." Brief for Appellant at 69–70 (quoting N.T., October 8, 1991, at 50).

Additionally, Appellant contends that the prosecutor asked the jury to consider an asserted lack of remorse on Appellant's

specifically referenced in this opinion are deemed insufficiently developed to warrant review.

part as an aggravating factor. *See id.* at 70 (citing N.T. October 8, 1991, at 55 ("He shed no tears for his victims, they are for himself. Shed no tears for anyone. Do justice in this courtroom . . . .")). According to Appellant, the district attorney's comments in this regard violated his Fifth Amendment privilege against self-incrimination, referencing a decision of the United States Court of Appeals for the Third Circuit. *See* Brief for Appellant at 71 (citing *Lesko v. Lehman,* 925 F.2d 1527, 1540 (3d Cir.1991)). Appellant also argues that the prosecutor effectively instructed the jurors that they could only uphold their oaths if they disregarded their feelings of sympathy. *See id.* (citing N.T. October 8, 1991, at 53 ("Sympathy for persons just because they like someone who is a relative is inappropriate.")). Finally, Appellant claims that the prosecutor mischaracterized mitigating circumstances by improperly preventing the jurors from considering Appellant's youth. *See id.* at ·72 (citing N.T., October 8, 1991, at 46 ("Curiously enough, the defendant's date of birth is a significant one to me. In June 1968 I was called upon to carry a weapon, as were some people here and people you know called upon to carry a weapon in the service of their county, not in the service of profit by the sale of drugs.")). Appellant also includes a brief assertion that all prior counsel were ineffective in failing to raise the above claims previously.

The Commonwealth argues that Appellant's claims of prosecutorial misconduct are previously litigated and/or waived. On the merits, the Commonwealth references precedent affording prosecutors "reasonable latitude" in arguing the Commonwealth's position to jurors, and the propriety of "oratorical flair" in advocating imposition of the death penalty. *See, e.g., Commonwealth v. Ligons,* 565 Pa. 417, 430, 773 A.2d 1231, 1238 (2001). Further, the Commonwealth develops that reversible error occurs only where the prosecutor has deliberately attempted to impair the objectivity of the fact finder, such that the unavoidable effect would be to create such bias and hostility toward the defendant that the jury could not render a true verdict. *See Commonwealth v. Miles,* 545 Pa. 500, 511, 681 A.2d 1295, 1300 (1996). According to the Com-

monwealth, the district attorney did not denigrate Appellant's constitutional rights, but rather, simply accurately noted that Appellant was not required to disclose witnesses before trial. With regard to the "vouching" claim, the Commonwealth develops the context of the prosecutor's references, which were in response to an implication by defense counsel that the witness only remembered facts at the prosecutor's suggestion. *See* Brief for Appellee at 62–63 (citing N.T. October 3, 1991, at 106–07, 115–16). Responding to the claim that the prosecutor denigrated the defense, the Commonwealth acknowledges that some of the challenged comments may have been sarcastic, but argues that they cannot reasonably be described as a deliberate attempt to destroy the objectivity of the fact finder. With regard to the misleading question concerning an asserted prior statement by Appellant, the Commonwealth notes that a defense objection was sustained, and that the prosecutor continued on without further reference to the question. *See id.* at 64 (citing N.T. October 7, 1991, at 134). Further, according to the Commonwealth, the district attorney presented no victim-impact evidence or argument, but rather, merely asked questions which elicited testimony recounting the tragic events at issue as they unfolded. *Accord Commonwealth v. Fisher,* 545 Pa. 233, 269, 681 A.2d 130, 147–48 (1996); *Commonwealth v. Story,* 476 Pa. 391, 396–97, 383 A.2d 155, 157–58 (1978).

Concerning the prosecutor's arguments, the Commonwealth notes that they are not evidence, *see Ligons,* 565 Pa. at 431, 773 A.2d at 1238, and in any event, argues that the challenged comments were appropriately developed with oratorical flair to advance the Commonwealth's case in the guilt phase or aggravating circumstances or mitigation rebuttal at the penalty phase. As to the latter, the Commonwealth asserts that many of the district attorney's statements were in response to the defense strategy of calling Appellant's family and friends to testify about his positive attributes. Further, the Commonwealth argues that Appellant's contentions are based on isolated portions of the transcript, that, when viewed in their full context, confirm that the district attorney consistently focused

on the four relevant statutory aggravating circumstances and appropriate mitigation rebuttal. As to Appellant's assertion concerning the advancement of an uncharged aggravator, the Commonwealth contends that the context of the challenged statement reveals that it was made in furtherance of the statutory aggravating circumstance that defendant committed a killing while in the perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). The Commonwealth also takes issue with Appellant's criticisms of the district attorney's remarks concerning the age mitigator, noting that such statements were relevant and proper, except to the degree that the prosecutor discussed his personal life, to which the trial court sustained a defense objection. *See* N.T. October 10, 1991, at 46. With reference to the prosecutor's comments concerning Appellant's lack of remorse, the Commonwealth develops that such comments have been deemed appropriate where they do not amount to an extended tirade. *See Commonwealth v. Lester*, 554 Pa. 644, 669–70, 722 A.2d 997, 1009 (1998); *Commonwealth v. Clark*, 551 Pa. 258, 276, 710 A.2d 31, 39–40 (1998). In the present case, the Commonwealth observes that the remarks were limited to a single passage. The Commonwealth also distinguishes the federal *Lesko* decision as involving a situation in which the defendant did not testify at the guilt phase, and thus, his Fifth Amendment privilege against self-incrimination was implicated, *see Lesko*, 925 F.2d at 1544–45 (concluding that a prosecutor's remarks about the defendant's failure to express remorse in penalty-phase testimony "penalized the assertion of his Fifth Amendment privilege against self-incrimination"), and as entailing a scenario in which the prosecutor had asked the jury to punish the defendant for not apologizing.[23]

**23.** As developed by the Third Circuit:

> The prosecutor [in *Lesko*] asked the jurors to consider [the defendant's] "arrogance" in taking the "witness stand" to present mitigating evidence about his background, without even having the "common decency to say I'm sorry for what I did." The prosecutor then parodied the gist of [the defendant's penalty-phase] testimony: "I don't want you to put me to death, but I'm not even going to say that I'm sorry."

*Lesko*, 925 F.2d at 1544.

Upon review of the parties' arguments, although we believe that some of the prosecutor's comments were ill-advised and approached the limits of appropriate advocacy, we agree with the PCRA court's central conclusion that the prosecutor's conduct, when viewed in context, did not so prejudice the jury such that it could not render a true verdict. We find the remarks concerning a lack of reciprocal discovery obligations to have been unnecessary but without significant prejudice; the asserted "vouching" to have been fairly responsive, *see generally Commonwealth v. Carson*, 590 Pa. 501, 530, 913 A.2d 220, 237 (2006) ("[A] prosecutor must be permitted to respond to arguments made by the defense."); and the claimed denigration of the defense to have been intemperate, but again, minimally prejudicial in terms of the overall trial. The prosecutor's inaccurate questioning concerning a statement by Appellant at a prior hearing was the subject of an objection which was sustained by the trial court, and the present claim is not developed in terms of a challenge to trial counsel's conduct in failing to seek further instructions or a mistrial. As the Commonwealth argues, the asserted victim-impact evidence was adduced during the course of appropriate questioning by the district attorney developing the factual circumstances of Appellant's offenses, and again, the claim is not developed in terms of a failure on the part of trial counsel to seek particularized instructions or a mistrial related to the testimony which ensued. We do find that the arguments containing references to the victims' families and his associated calls for justice approached the limits of appropriate advocacy at the time of Appellant's trial, when victim-impact evidence was not an appropriate consideration in capital sentencing, *see supra* note 21. On direct appeal, however, this Court reviewed the full record and determined that the sentences imposed were not the product of passion, prejudice, or any other arbitrary factor, but rather, were "based upon compelling evidence that appellant killed two patrons in the course of a robbery in a crowded bar," *Gibson*, 547 Pa. at 105–06, 688 A.2d at 1169, and our present review remains consistent with such prior determination. We also agree with the Commonwealth that the district attorney's claimed invocation

of an uncharged aggravator was, in fact, a legitimate argument related to the Section 9711(d)(6) aggravator, *see* N.T. October 10, 1991, at 49–50 (referencing a desire on the part of Appellant not to be held responsible for his acts in connection with advancement of the in-perpetration-of-a-felony aggravator), and the comments concerning the age mitigator were proper to the extent that they did not concern the prosecutor's personal life.

With reference to the district attorney's commentary concerning Appellant's lack of remorse, we agree with the Commonwealth that the federal *Lesko* decision is distinguishable on account of Appellant's decision to testify at the guilt phase of trial, and in light of substantial differences in the duration and acridity of the respective remarks. Additionally, in terms of the Fifth Amendment interests, the Pennsylvania decisional law offers a "demeanor" justification to authorize prosecutorial commentary on a capital defendant's failure to show remorse, *see, e.g., Commonwealth v. Fletcher*, 580 Pa. 403, 436, 861 A.2d 898, 917 (2004), which facially applies to the remarks challenged here. Finally, we agree with the Commonwealth that the comments at issue were reasonably limited and do not amount to a tirade.

Based on the above review of the claims raised on appeal, the order of the PCRA court is affirmed insofar as it dismissed all claims other than that of ineffective assistance of counsel associated with the investigation, development, and presentation of mitigating evidence. With respect to this claim, the post-conviction court's order is vacated, and the matter is remanded for further development consistent with this opinion. Jurisdiction is relinquished to permit the issuance of a dispositive order in light of the additional development, and to ensure briefing upon any further appeal.

Justice GREENSPAN did not participate in the consideration or decision of this case.

Justice BAER and Justice TODD join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice McCAFFERY joins.

Justice EAKIN files a concurring and dissenting opinion.

Chief Justice CASTILLE, *concurring*.

I join Mr. Justice Saylor's learned Majority Opinion, with the exception of the penalty phase claim upon which the Court remands for additional consideration. Although I concur in the result on that claim, I emphasize at the outset the following points of agreement: (1) I join the Majority's explanation why, in light of the disappointing testimony of trial counsel upon this Court's prior remand, the remaining dispositive issue is *Strickland*[1] prejudice; (2) I join the Majority's explanation of the inconsistency and incompleteness of the *Strickland* prejudice analysis conducted by the PCRA[2] judge; and (3) I join the Majority's mandate to remand the claim for development and specific findings on *Strickland* prejudice. Respecting the last point, I stress my particular agreement with the directive that the PCRA court "is to develop a specific comparison of the mitigation case offered at trial with the credited evidence offered on post-conviction review," the object being an explanation of why the PCRA judge believes— if he still does so believe following a proper, global prejudice analysis—that there is a **reasonable probability** that the result of the penalty hearing here would have been different if only foregone and credited evidence respecting appellant's character and circumstances had been presented.

In my view, it is a close question whether the claim of *Strickland* prejudice warrants further hearing, as opposed to summary rejection. My joinder in the remand follows largely out of respect for the care and prudence in the Majority's explanation of the deficiencies in the PCRA court's analysis; the importance of emphasizing to the courts below their duties of precision in capital appeals; and the necessity for a dispositive order where this Court might otherwise be deadlocked in

**1.** *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**2.** Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546.

a capital case. I write separately because I have some modest points of disagreement with the Majority's analysis; it is useful to explain my reservations whether prejudice is provable here, given the type of mitigation evidence offered, arrayed against the powerful aggravating circumstance of multiple murders; and I have a different take on the proper role of recent federal habeas corpus decisions of the U.S. Supreme Court, applying *Strickland,* upon Pennsylvania trials conducted before those decisions were announced.

## I.

Soon after re-authorizing the separate States to provide for capital punishment in the 1970s, the U.S. Supreme Court innovated what amounts to a "kitchen sink" rule concerning mitigation evidence in capital trials, and imposed that new rule upon the States. For reasons which are now primarily of academic or historical interest, Supreme Court case decisions have left us with a regime where those States that adopted capital punishment: (1) must require proof of specific aggravating circumstances to distinguish among first-degree murderers in order to limit capital punishment to those who are "the worst of the worst," and (2) must not categorically preclude capital defendants from introducing, and factfinders from considering, any evidence in mitigation relating to the defendant's character or record (a very broad category) and the circumstances of the crime. *See Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (adopting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion)). For a thorough and illuminating description of the development of the mitigation evidence requirement imposed on the States-what Justice Clarence Thomas has called "[t]he mitigating branch of our death penalty jurisprudence"—see Justice Thomas's concurring opinion in *Graham v. Collins,* 506 U.S. 461, 479–92, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) (Thomas, J., concurring). The Pennsylvania General Assembly has adopted a conforming death penalty statute that follows the federal judicial command, with a series

of enumerated aggravating and mitigating circumstances, including a "catchall" mitigator. 42 Pa.C.S. § 9711.

The resulting High Court-dictated penalty paradigm involves "weighing" what seem to be competing considerations, but in fact capital sentencing is twice heavily slanted in favor of a non-death verdict. First, not all first-degree murderers are eligible for the death penalty: in Pennsylvania, the Commonwealth has to prove, beyond a reasonable doubt, a specific statutory aggravator or aggravators. Second, even if the Commonwealth proves the defendant's exceptionality among his brethren of first-degree murderers, the defendant is guaranteed an opportunity for the jury—and all it takes is one juror—to spare him from death for reasons having to do with mitigation.[3] The High Court's decisional law in the wake of this paradigm has been subjected to constant "tinkering" (Justice Harry Blackmun's famous coda)[4] or "annual improvisation" (Justice Scalia)[5] resulting in new or retooled rules—concerning who is eligible, level of proof, how the jury is to weigh the proof, what the jury is to be told, requirements of juror unanimity versus individual juror nullification, and so on. This reality, combined with the delays and multiple levels of

**3.** Justice Antonin Scalia has described the two-part paradigm as follows:

> over the years since 1972 this Court has attached to the imposition of the death penalty two quite incompatible sets of commands: The sentencer's discretion to impose death must be closely confined, *see Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (*per curiam*), but the sentencer's discretion **not** to impose death (to extend mercy) must be unlimited, *see Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). These commands were invented without benefit of any textual or historical support....

*Callins v. Collins,* 510 U.S. 1141, 1141–42, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Scalia, J., concurring).

**4.** *Callins,* 510 U.S. at 1145, 114 S.Ct. 1127 (Blackmun, J., dissenting) ("From this day forward, I no longer shall tinker with the machinery of death.")

**5.** *See Morgan v. Illinois,* 504 U.S. 719, 751, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (Scalia, J., joined by Rehnquist, C.J., and Thomas, J., dissenting) (adverting to "the fog of confusion that is our annually improvised Eighth Amendment, 'death is different' jurisprudence").

exacting review, has further complicated capital jurisprudence. It has even come to the point where a Pennsylvania capital murderer can secure a new penalty trial twenty-five years after conviction because a federal court panel, sitting on habeas review, feels that his trial did not conform to the teaching of a non-retroactive case innovation which did not exist at the time of his trial. *See Abu–Jamal v. Horn,* 520 F.3d 272 (3d Cir.2008) (granting penalty phase relief because panel felt that 1982 sentencing proceeding did not conform to future decisions in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and because panel deems this Court's reading of those decisions to be "objectively unreasonable").[6] The threat of dismissive federal responses to flexible state procedural rules can lead to state legislatures and courts adopting ever-more inflexible rules. Meanwhile, in cases where the applicability and meaning of new judicial rules of substance adopted by the High Court is debatable—and often, a lively debate is found in the fractured opinions of the U.S. Supreme Court announcing the new rule—inevitably Pennsylvania state jurists have been deemed "objectively unreasonable" by their federal counterparts, so that death sentences may be set aside by our federal brethren. One may leave it to "academic" observers and to those committed to one or the other side of the death penalty debate

**6.** The federal Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") adopted a series of restrictions upon federal habeas corpus review of state court convictions. Under AEDPA, a federal court cannot grant habeas relief to a state prisoner on a claim that was adjudicated on the merits in the state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). With respect to subsection (d)(1), the U.S. Supreme Court has held that relief may issue if the state court determination involves an "objectively unreasonable" application of clearly-established precedent from the High Court. *See Wiggins v. Smith,* 539 U.S. 510, 520–21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

whether, in the long run, the federal judicial tinkering has made capital jurisprudence more or less arbitrary than before. What is not debatable is that no sentence of death has been carried out in Pennsylvania, under the now three-decade-old federal judicial hegemony, except in the case of "volunteers," *i.e.,* defendants who have been permitted to act upon their desire not to pursue further appeals.

Of course, I recognize and welcome our duty to follow the Supremacy Clause, and I accept that this Court is bound by relevant majority expressions from the High Court, irrespective of their changeableness or the persuasiveness of their reasoning. As pertinent to this appeal, I accept that the High Court has ordered that state jurors in capital cases must hear any evidence proffered in mitigation relevant to the defendant's character and background. By corollary, on collateral attack, a capital defendant can assail his prior counsel for failing to produce such evidence in mitigation. Thus, just as the jury may be required to hear whatever the defendant can muster concerning his personal history, including family background and environment, alleged substance abuse, supposed mental limitations, *etc.,* capital defense lawyers are subject to accusations of incompetence for failing to present every shred of evidence respecting that "life history" at trial. However, the jury is not required to accept such evidence as mitigating in a particular case. *Eddings,* 455 U.S. at 114–115, 102 S.Ct. 869 (capital sentencer may determine weight to be given relevant mitigation evidence). By the same token, in cases of collateral attack sounding in ineffective assistance of counsel for failing to produce mitigation evidence, counsel cannot automatically be deemed ineffective whenever there is a failure to present the complete psycho-biography of the defendant.

In assessing *Strickland* prejudice, the first point worthy of note is that there is nothing facially surprising or arbitrary about the death sentences imposed in this case. Appellant distinguished himself even among first-degree murderers. Appellant is responsible for the first-degree murder of two victims, including an off-duty police officer who sought to come

to the assistance of the patrons and employees in the Philadelphia bar that appellant and his confederate entered with handguns on Christmas Eve in 1990, with robbery on their minds. In addition to killing two Christmas Eve celebrants in cold blood, appellant risked death or serious injury to other bar employees and patrons as he and his confederate fired shots into the crowded bar that night. None of the sociological or historical concerns that led the U.S. Supreme Court to its micromanagement of State death penalty jurisprudence is implicated here.

In a case where a verdict of death is returned, at least three levels of complete review will follow, and trial counsel, in that review, is almost always faulted for failing to present additional or different mitigation evidence. But the test for *Strickland* prejudice requires the defendant to prove actual prejudice, a "reasonable probability" that, but for counsel's lapse, the result of the penalty proceeding would have been different. Where the defendant is responsible for multiple murders and where he risked even greater carnage, he should have great difficulty in securing *Strickland* relief premised upon foregone, supplemental mitigation evidence. As noted in my responsive opinion in *Commonwealth v. Zook*, 585 Pa. 11, 887 A.2d 1218 (2005):

> ... I think that it is unrealistic in the extreme ever to discount the difficult uphill battle any capital defense lawyer faces where, as here, one of the aggravating circumstances involves the fact that his client elected to commit multiple first-degree murders. This is a mark of distinction that seems different in kind from other statutory aggravators. Thus, if the foregone additional mitigation evidence in this case were mere catchall "I had a bad childhood" evidence, I doubt that this Court could find that appellant sustained his burden to prove prejudice.[2]

---

2. *See Commonwealth v. Moore*, 580 Pa. 279, 860 A.2d 88, 99 (2004) (noting that evidence of traumatic childhood "may or may not be perceived as mitigating one juror might see this as reason for sympa-

thy; another might see it as assuring [the defendant] his violence permanently ingrained in him").

*Id.* at 1236 (Castille, J., concurring).

In this case, if the only additional mitigation evidence were that cited by the PCRA judge in his most recent analysis, I would deny relief now. As the Majority notes, the jury was apprised of evidence along the lines of this "life history" information at the penalty hearing. Moreover, assuming a reasonable jury with any moral center, it is highly improbable to believe that additional evidence of appellant's childhood circumstances and voluntary drug and alcohol abuse would have made a difference in the face of the substantial aggravating factors. *Cf. Schriro v. Landrigan,* 550 U.S. 465, 127 S.Ct. 1933, 1943–44, 167 L.Ed.2d 836 (2007). But, as the Majority notes, appellant's proffer was broader and was not permitted to be developed, including opinions from defense mental health experts trying to fashion a mental health mitigation argument from appellant's personal circumstances. From the proffers— which track the generic mental health defense pleadings we find in most capital cases—I do not believe this evidence is particularly strong and of course it may be rebutted by the Commonwealth. However, given that counsel conducted no investigation, I agree that the PCRA court was obliged to allow for its development, and the better course here is to remand with a directive for that court to do so and to engage in a comprehensive *Strickland* prejudice analysis.[7]

**7.** Like Justice Eakin, I cannot join in footnote 11 of the Majority Opinion, which suggests there is some "empirical support" for the "notion" that mental health mitigation theories and evidence may sway capital jurors favorably. I think that is impossible to say. Moreover, given the stakes in the death penalty debate, and the consequent blurring of "academics" and "advocates," I do not know which purported "empirical studies" are trustworthy or accurate. Generally, there is no peer-review vetting of law review articles, and many articles obviously are slanted to forward the views and biases of the authors, or with an eye toward advancing a particular claim. This Court has seen its share of sham "empirical" claims. Moreover, I believe there is at least equal force to the points made in Justice Eakin's dissent. Most people with difficult childhoods, and even with residual mental health issues arising from those circumstances, do not become multiple murderers. It is just as easy to imagine a jury being insulted by the

## II.

Next, I turn to the question of the applicability and role of federal habeas corpus decisions from the U.S. Supreme Court, applying *Strickland,* which were decided after the actions of counsel here that form the basis for the *Strickland* claim. The Majority accurately notes that there has been some division on this Court concerning the effect of such decisions. Majority Op. at 1121–22 & n. 8. The division concerns *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). A more recent decision, involving federal habeas review of a Pennsylvania state conviction presenting a claim of counsel ineffectiveness respecting mitigation evidence, is *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). In *Rompilla,* the Court, by 5–4 decision reversing a Third Circuit ruling authored by then-Judge, now Associate Justice Samuel A. Alito, Jr., held that this Court's handling of the *Strickland* claim was "objectively unreasonable."

As a matter of law—since all three of these decisions were rendered upon federal habeas corpus review of state court convictions under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")—and as a matter of fact—because the Court said so all three times-these cases did not purport to establish any new federal constitutional rule or standard, but merely **applied** the existing rule of *Strickland v. Washington,* through the deferential filter of AEDPA.[8] This

argument that such factors should operate in some way to diminish crimes such as these.

**8.** The *Strickland* Court was not so constrained, as that case was decided long before AEDPA's deferential standard was adopted. The Court is no longer free to innovate new constitutional rules upon collateral review.

Of course, even under AEDPA, a federal court may consider an element of a *Strickland* claim *de novo* if the state court wrongly failed to reach the merits, or if it did not address an element. *See, e.g., Rompilla,* 545 U.S. at 390, 125 S.Ct. 2456 (engaging in *de novo* assessment of *Strickland* prejudice because state courts did not reach that element given their conclusion that counsel's performance was not deficient).

Court noted the role of such decisions soon after *Williams* was decided:

> *Williams* does not alter the legal standard governing appellant's ineffectiveness claim; as the U.S. Supreme Court emphasized in *Williams,* it is still the *Strickland* test that governs the evaluation of counsel's penalty-phase preparation and performance. Indeed, if *Williams* had set forth a new or modified *Strickland* standard, appellant would not be entitled to its benefit since counsel in this case were acting long before *Williams* was decided. Appellant himself implicitly recognizes this fact, as he states elsewhere that *Williams* "did not break any new ground in describing the obligations of counsel in a capital case." Reply Brief of Appellant, 3. Accordingly, *Williams* is relevant to our inquiry in the limited sense that it represents an example of the U.S. Supreme Court's application of its settled *Strickland* test in factual circumstances which, according to appellant, are materially indistinguishable from the facts presented here.

*Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 42 (2002).

*Bond* accurately describes the role of habeas cases from the High Court which consider *Strickland* claims under AEDPA. Such cases cannot break new *"Strickland"* ground, and cannot impose new standards upon counsel. Indeed, in AEDPA cases, the Court does not even render a pure *Strickland*-application holding; it renders an AEDPA holding, which is not the same thing. The question before the Court under AEDPA is the **reasonableness** of the state court's *Strickland* analysis, and not the performance of counsel in some absolute sense. *E.g., Rompilla,* 545 U.S. at 380, 125 S.Ct. 2456 ("Rompilla's entitlement to federal habeas relief turns on showing that the state court's resolution of his claim of ineffective assistance of counsel under *Strickland v. Washington, supra,* 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'") (citing 28 U.S.C. § 2254(d)(1)). Thus, a federal court is obliged to reject a *Strickland* claim that it might deem merito-

rious on direct review, if the court realizes that the state court decision, though not to its personal liking, was objectively reasonable. *See Wiggins,* 539 U.S. at 520–21, 123 S.Ct. 2527 ("In order for a federal court to find a state court's application of our precedent to be 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.' ") (citation omitted).

To be sure, a court faced with materially identical facts to a decision of the High Court involving an "application" of *Strickland* under AEDPA would be hard-pressed not to follow the High Court's outcome; but the legal "standards" governing review of counsel's performance in such cases still derive only from *Strickland* (and any other relevant, clearly-established precedent of the U.S. Supreme Court in existence at the time counsel acted). In addition to being commanded by salutary restrictions upon federal habeas corpus review, this limitation comports with *Strickland's* focus upon contemporaneous assessment, and its admonition to avoid condemning counsel via hindsight.

The U.S. Supreme Court realizes this elemental fact. The Court in *Williams* made clear that "the merits of [the defendant's] claim are squarely governed by our holding in *Strickland*," which set forth a test that requires a "case-by-case examination." 529 U.S. at 390, 391, 120 S.Ct. 1495. Indeed, if there had **not** been a clearly-established rule whose application was at stake, there would have been no basis for federal collateral review at all. *Id.* at 390, 120 S.Ct. 1495. Citing AEDPA, the *Williams* Court made clear that the narrow question it decided was whether the state court resolution of the *Strickland* claim "was either 'contrary to, or involved an unreasonable application of,' that established law." *Id.* at 391, 120 S.Ct. 1495.

In *Wiggins,* Justice O'Connor, the author of *Strickland,* wrote for a seven-Justice majority and stressed the same essential point. AEDPA, she explained, limited federal habeas review of state convictions "to the law as it was 'clearly established' by our precedents at the time of the state court's

decision." *Wiggins,* 539 U.S. at 520, 123 S.Ct. 2527. In discussing *Williams,* the *Wiggins* Court further stressed that that decision was "illustrative of the proper application of these [*i.e.,* the *Strickland* ] standards" and that "we ... made no new law in resolving Williams' ineffectiveness claims." *Id.* at 522, 123 S.Ct. 2527. The Court also stressed that its review of the *Strickland* claim, as a *Strickland* claim, was "circumscribed" by the review paradigm established by AEDPA. *Id.* at 520, 123 S.Ct. 2527. Notably, in resolving the mitigation/ineffectiveness claim before it, the *Wiggins* Court went on to speak of "the professional standards that prevailed in Maryland in 1989" (Wiggins was tried and convicted in Maryland in 1989), along with other "well-defined norms" of **that** time. *Id.* at 524, 123 S.Ct. 2527.

The 5–4 decision in *Rompilla* is to similar effect. Justice Souter's Majority Opinion recognized that *Strickland*—not *Wiggins,* not *Williams*—was the clearly established law at issue; acknowledged that review of the *Strickland* claim was circumscribed by the AEDPA standard; and stressed *Strickland's* recognition that, in evaluating counsel's conduct, "hindsight is discounted by pegging inadequacy to 'counsel's perspective at the time' investigative decisions are made." 545 U.S. at 380–81, 125 S.Ct. 2456 (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). The Opinion made repeated references back to the benchmark of viewing counsel's decisions from their perspective at the time of trial preparation. Five Justices thought that this Court's resolution of the *Strickland* claim was "objectively unreasonable;" four thought it was reasonable; and so, a new penalty hearing was ordered.

When today's Majority says that the "legal standards articulated" in *Williams* and *Wiggins* "apply" to cases involving trials pre-dating those decisions, respectfully, I do not believe the statement is strictly accurate. Such a statement is accurate only to the extent those "legal standards" precisely parrot what was already said in *Strickland* or some other governing authority (the norms in Pennsylvania, as it were) extant at the time counsel acted. *Strickland* certainly applies, but *Williams* and *Wiggins* only "apply" to the extent they are

476

redundant of *Strickland*—or, again as a practical matter, to the extent the material circumstances are indistinguishable from one of the High Court's "application" decisions. Thus, for example, *Rompilla* does not establish a general rule that counsel in a capital case must always seek the case file relating to the defendant's prior convictions. Rather, it was the entirety of the circumstances that led the court to conclude that counsel's performance was deficient. Generally speaking, then, these AEDPA decisions applying *Strickland* "apply" to concluded cases only to the extent that they do not really matter at all except as "ditto" citations.[9]

It is not accidental that the decisions in *Williams, Wiggins,* and *Rompilla* involve much fuller factual discussions than are usually found in High Court decisions. Such an approach is an inevitable byproduct of the limited review that was at issue under AEDPA. For our purposes, it is enough to note that the factual circumstances here are not remotely identical to those presented in any of the three cases, and we are not at liberty to extrapolate an extension of *Strickland* to condemn counsel retroactively. I agree with the Majority that counsel's confession on remand to a **non-investigation,** for no good reason, fails the *Strickland* performance standard-because it does not comply with *Strickland,* not because it does not comply with some other or later case "standard." And I agree that the remaining, controlling question is prejudice.[10]

Justice McCAFFERY joins this opinion.

9. Of course, even though "inapplicable," the later cases could be deemed significant in some amorphous sense, *i.e.,* as revealing what ever-shifting High Court majorities construe *Strickland* to mean. But such speculation does not advance the concrete tasks this Court faces.

10. I realize that *Strickland* and later cases refer to American Bar Association-promulgated standards as guides for evaluating the reasonableness of attorney performance respecting mitigation investigations. *See Rompilla,* 545 U.S. at 387, 125 S.Ct. 2456 (quoting *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052)). However, I would be wary of going too far with such observations, absent evaluation and adoption of such commands by those in authority in Pennsylvania, or an express command along those lines from the High Court. Moreover, the Court has recognized that applicability of the standards may be subject to dispute. *See Rompilla,*

Justice EAKIN, *concurring and* dissenting.

As the majority notes, I dissented from the prior remand to the PCRA court because I felt the record supported Attorney Gaskins' decision to present only Appellant's positive qualities at the penalty phase, and this was not an unreasonable strategy. *See Commonwealth v. Gibson*, 940 A.2d 323, 327–29 (Pa.2005) (Eakin, J., dissenting statement); Majority Op., at 416 n. 3, 951 A.2d at 1117 n. 3. I now dissent from this second remand to the PCRA court.

Although claims of trial counsel's ineffectiveness raised for the first time in a PCRA petition are no longer waived, *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002), that holding does not apply here because Appellant's direct appeal concluded prior to *Grant. See Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 594 (2007). In pre-*Grant* cases, allegations of trial counsel's ineffectiveness are waived if they are not raised in post-trial motions or direct appeal proceedings. *Id.*, at 594 (citing 42 Pa.C.S. § 9544(b); *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 812 (2004)). Appellant's ineffectiveness claims therefore have to be analyzed under the pre-*Grant* framework, where the PCRA court can only review direct appeal counsel's ineffectiveness. *Id.* Appellant must argue each layer of ineffectiveness, on all three prongs of the ineffectiveness standard. *Id.*

In his statement of questions presented, Appellant includes boilerplate language that all prior counsel were ineffective. Appellant's Brief, at 1. Thus, he met his burden of pleading direct appeal counsel's ineffectiveness for failing to raise the

545 U.S. at 387, 125 S.Ct. 2456 ( [T]he Commonwealth has come up with no reason to think the quoted standard impertinent here.). Of course, the ABA does much good work to advance the cause of justice. In recent years, however, the ABA has chosen to be a very active voice, almost invariably on the defense side, in criminal and particularly capital matters. Its activism in this regard has been pronounced enough to lead many prosecutors away from the organization. Notwithstanding the good work and dedication of the ABA generally, and its prestige, in this instance at least, I would keep in mind that its suggestions are those of a private organization, not answerable to the peoples voice or purse, offering one view, which does not necessarily account for the views of all with front-line experience in these matters.

issue of trial counsel's ineffectiveness. *See Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651, 656 (2003). However, Appellant must also present argument as to direct appeal counsel's deficient representation, developing each of the three ineffectiveness prongs. *Washington,* at 595. Appellant has satisfied that requirement regarding direct appeal counsel's failure to appeal Attorney Gaskins' choices regarding investigation and presentation of certain mitigation evidence. Appellant's Brief, at 44.

Here, the majority determines it is "debatable" which trial counsel, Attorney Ciccone or Attorney Gaskins, should be attributed with ineffectiveness, but states that issue is only collateral to our inquiry. Majority Op., at 425, 951 A.2d at 1124. However, that issue is central to our inquiry since this is a pre-*Grant* case; the conduct of Gaskins and Ciccone had to be raised on direct appeal. Appellant raised "numerous claims of ineffective assistance of trial counsel [on direct appeal]." *Commonwealth v. Gibson,* 547 Pa. 71, 688 A.2d 1152, 1165 (1997). This Court found trial counsel effective. *Id.,* at 1165–69. Only the conduct of Appellant's direct appeal counsel is reviewable in the instant PCRA petition.

Since our remand in this case, the United States Supreme Court in *Abdul–Kabir v. Quarterman,* 550 U.S. 233, ——, 127 S.Ct. 1654, 1659, 167 L.Ed.2d 585 (2007), addressed an issue that is not identical to the issue here, but the dissenting justices provided persuasive summaries of the nature of ineffectiveness law concerning mitigation evidence. Justice Scalia opined:

> While one can believe that "the impetuousness and recklessness that may dominate in younger years can subside," [*Johnson v. Texas,* 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) ], one can also believe that a person who kills even in his younger years is fundamentally depraved, and more prone to a life of violent crime. *Johnson* itself explicitly recognized this point, denying relief despite "the fact that a juror might view the evidence of youth as aggravating, as opposed to mitigating." [*Id.*].

*Id.,* at 1686 (Scalia, J., dissenting).[1]

As articulated by Justice Scalia, I disagree with the belief that introducing negative aspects of defendants' lives at the penalty phase is *per se* beneficial for defendants. *See* Majority Op., at 423–24 n. 11, 951 A.2d at 1123 n. 11. While some cases call for presentation of mental considerations and other negative aspects as mitigation evidence, similar evidence may at other times hurt a defendant's cause. The decision is for defense counsel's judgment, and if a reasonable basis for the decision exists, our jurisprudence does not allow us to second-guess it on appeal. Sentencing counsel's conduct in this area is best reviewed on a case-by-case basis under the traditional ineffectiveness inquiry without deferring to the but often general, impracticable thoughts of scholarly writers.

Regarding the prejudice prong, the majority remands again to the PCRA court to determine if there is a reasonable *probability* Appellant's sentence would have been different if Gaskins presented negative aspects of Appellant's life, including mental health mitigation, instead of the positive aspects that were presented. Majority Op., at 422–24, 951 A.2d at 1122–23. Since there are conflicting views on whether pre-

1. Regarding the nature of jury instructions concerning mitigation evidence, Chief Justice Roberts persuasively opined:

 We give ourselves far too much credit in claiming that our sharply divided, ebbing and flowing decisions in this area gave rise to "clearly established" federal law. If the law were indeed clearly established by our decisions "as of the time of the relevant state-court decision," *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 ... (2000), it should not take the Court more than a dozen pages of close analysis of plurality, concurring, and even dissenting opinions to explain what that "clearly established" law was.... When the state courts considered these cases, our precedents did not provide them with "clearly established" law, but instead a dog's breakfast of divided, conflicting, and ever-changing analyses. That is how the Justices on *this* Court viewed the matter, as they shifted from being in the majority, plurality, concurrence, or dissent from case to case, repeatedly lamenting the failure of their colleagues to follow a consistent path. Whatever the law may be today, the Court's ruling that 'twas always so—and that state courts were "objectively unreasonable" not to know it, *Williams, supra,* at 409, 120 S.Ct. 1495 ...—is utterly revisionist.

 *Abdul–Kabir,* at 1676 (Roberts, C.J., dissenting) (emphasis in original).

senting mitigation evidence of a defendant's negative attributes helps a defendant at sentencing, and some of Appellant's witnesses already testified to his troubled childhood at sentencing, Majority Op., at 422, 951 A.2d at 1122, I do not see how it is reasonably *probable* the sentence imposed here would have been different if such negative mitigation evidence was presented. While the majority criticizes this opinion for relying on dissenting opinions from two United States Supreme Court opinions, Majority Op., at 421 n. 8, 951 A.2d at 1121 n. 8, the majority's "authority" for the notion that presentation of mental health mitigation evidence can be beneficial for a defendant at sentencing is a law review article, three federal court decisions, and one Illinois state court decision—none of which are binding authority on this Court. Majority Op., at 422–24 n. 11, 951 A.2d at 1122–23 n. 11. The law review article and one of the federal court decisions were published after we affirmed on direct appeal; thus, direct appeal counsel could not be ineffective for not being aware of that law. *Commonwealth v. Williams,* 594 Pa. 366, 936 A.2d 12, 28 (2007) (counsel not ineffective for failing to foresee changes in law). Since the effect of negative mitigation evidence is uncertain, and the law regarding such evidence was not clear when this case was on direct appeal, I would not find direct appeal counsel ineffective for not raising Ciccone's or Gaskin's conduct in this regard as an ineffectiveness claim on direct appeal.

Regarding the remaining ineffectiveness prongs, the majority states counsel has to conduct a thorough investigation *or* make reasonable decisions rendering such investigations unnecessary. Majority Op., at 424, 951 A.2d at 1123 (citations omitted). As I noted in my dissenting statement, "[Attorney Gaskins] admittedly did not investigate or present the [negative aspects of Appellant's life], but he did present the [positive aspects], in detail." *Gibson,* 940 A.2d at 327 (Eakin, J., dissenting statement). As the majority also states, Appellant made an "eleventh hour" decision to employ Gaskins in place of Ciccone before trial, yet now complains of Gaskins' conduct. Majority Op., at 409–11, 951 A.2d at 1114–15. Gaskins apparently requested a continuance with the trial court, which was

denied. *See Gibson,* 940 A.2d at 324 (Nigro, J., concurring and dissenting statement); Majority Op., at 431–34, 951 A.2d at 1128–29. The majority notes Appellant's decision to change counsel appears "well founded" since original counsel Ciccone had not conducted a mitigation investigation. Majority Op., at 425 n. 12, 951 A.2d at 1124 n. 12. Under the circumstances, Gaskins' decision to concentrate on the guilt phase was quite understandable and not unreasonable, particularly in light of Appellant's tardiness in bringing him into the case, and the trial court's apparent denial of Gaskins' request for a continuance. It is not surprising Gaskins focused on pursuing a not guilty verdict; in fact, if he had not focused enough time on that purpose, he would have been deemed ineffective for not focusing on the guilt phase.[2]

At sentencing, Gaskins presented nine witnesses and "tried extensively to personalize [A]ppellant and not leave the jury with only those negative aspects of his life extrapolated during the trial." *Gibson,* 940 A.2d at 328 (Eakin, J., dissenting statement). Gaskins' conduct may or may not have provided the absolute best choice, but that is not the test; if his decisions were reasonable under the circumstances, we cannot intervene because we in hindsight feel a different strategy should have been utilized. *See* Majority Op., at 425, 951 A.2d at 1124 (citing *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 735 (2000) ("The reasonableness of counsel's decisions cannot be based upon the distorting effects of hindsight.")). Due to his late entry at Appellant's request, it was reasonable for Gaskins to focus on exoneration rather than mitigation, and to present Appellant's positive aspects as he did through extensive testimony at sentencing. Thus, direct appeal counsel did not err in not raising Gaskins' ineffectiveness in this regard on direct appeal.

The majority's rationale creates the potential for abuse of the litigation and PCRA process. If capital defendants choose to make an "eleventh hour" replacement of counsel, counsel

2. Appellant raised ineffectiveness claims for counsel's conduct during the guilt phase. *See* Majority Op., at 412–15, 951 A.2d at 1116-17.

will be under extreme time pressure to prepare and conduct a capital trial; if investigation of mitigation evidence is truncated by this decision, despite counsel's hard work under those circumstances created by the defendant, counsel's conduct should not be susceptible to a meritorious ineffectiveness claim.

I join the remainder of the majority's opinion,[3] with the following exception. I join the majority's conclusion police presence at trial did not prejudice Appellant. Majority Op., at 450–53, 951 A.2d at 1139–40. However, I do not join the broad statement that "police officers' attendance at trial may cause concern with regard to jurors' perceptions and courtroom atmosphere." *Id.*, at 450, 951 A.2d at 1139. Certainly if their presence were so pervasive and domineering as to make one afraid merely by their number or attitude, a problem may be seen, but likewise their presence may add a measure of security to the atmosphere. Something more than mere attendance[4] would have to exist to trigger such concerns, much less prejudice to a defendant, and I hope the majority's statement will not be interpreted as discouragement of their presence.

---

3. On all remaining ineffectiveness claims, I join the majority opinion as I interpret the majority's analysis of those claims to be a review of direct appeal counsel's conduct.

4. Police officers may attend a trial as can any other member of the public. *See generally Commonwealth v. Contakos*, 499 Pa. 340, 453 A.2d 578, 579 (1982) (courts open to public); *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (same). Their status as police officers alone cannot prevent them from exercising that right.